2009 OK 51

**Dorothy GRIFFITH, Plaintiff/Appellant,**

v.

**CHOCTAW CASINO OF POCOLA, Oklahoma, and the Choctaw Nation of Oklahoma, Defendants/Appellees.**

No. 104,887.

Supreme Court of Oklahoma.

June 30, 2009.

Rehearing Denied April 12, 2010.

Eddie A. McCroskey, Poteau, OK, for plaintiff/appellant.

Eric D. Janzen and Brett D. Cable, McAlester, OK, for defendants/appellees.

PER CURIAM.

¶1 One question is presented in this appeal: Is the state district court a court of competent jurisdiction as used in the gaming compact between the Choctaw Nation of Oklahoma and the State of Oklahoma such that the district court may exercise jurisdiction over this Indian-country arising negligence action filed by a casino patron against the Choctaw tribe and its casino? We answer in the affirmative.

## I. Facts and Proceedings

¶2 The Choctaw Nation of Oklahoma, a federally recognized Indian tribe [1] (Tribe), owns a casino which it operates through its tribal enterprise, the Choctaw Casino of Po-

---

1. Notice of Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs published in the Federal Register on April 4, 2008. 73 FR 18553–01.

The Bureau of Indian Affairs lists 38 federally-recognized Indian tribes in Oklahoma in its notice published in the Federal Registry on July 12, 2002.

cola, Oklahoma (casino). The Tribe offers class III gaming[2] to its casino's patrons pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2722 (1988), and the State–Tribal Gaming Act, 3A O.S.Supp.2004, §§ 261–281, which includes the statutory "Model Tribal Gaming Compact" (compact), id. § 281, signed by the Tribe and effective February 9, 2005.[3]

¶3 Dorothy Griffith[4] (Griffith) went to the casino on February 11, 2005. According to Griffith, as she and other patrons approached an entrance to the casino, she heard a casino guard directing patrons to the north entrance. As Griffith followed the others toward the north entrance, she stepped into a flowerbed and fell on her face and head. Griffith was treated in a hospital emergency room in Fort Smith, Arkansas. Griffith claimed her injuries were caused by the negligence of the casino employees and agents. Griffith submitted notice of tort claim to the casino and the Tribe pursuant to the compact.[5] When the Tribe and the casino failed to act upon the tort claim, it was deemed denied.

¶4 Griffith filed a *tort action* in the state district court in LeFlore County against the casino and the Tribe. The Tribe moved to dismiss the tort action on the basis of tribal sovereign immunity from suit in state court, arguing that Oklahoma state courts may not exercise jurisdiction over a sovereign Indian tribe unless Congress or the Indian tribe has clearly consented to suit in state court or otherwise clearly waived tribal immunity. Griffith responded that the Tribe consented to suit in the compact which states the "tribe consents to suit on a limited basis with re-

spect to tort claims" and the "tribe consents to suit against the enterprise in a court of competent jurisdiction with respect to tort claims." The Tribe argued that exclusive jurisdiction over tort claims arising in Indian country against the Tribe was vested in the tribal courts at the time the compact was executed; the compact preserved the tribal court's exclusive jurisdiction by declaring that the compact does not alter tribal, federal or state adjudicatory jurisdiction; and therefore, the consent to suit in a court of competent jurisdiction in the compact is consent to suit in tribal court only. The Honorable Ted A. Knight, Judge of the District Court, concluded that tribal courts and federal courts have jurisdiction over Indian tribes but state courts do not and dismissed the action.

¶5 Griffith appealed the dismissal. The Tribe moved to make this appeal a companion to the appeal from the same district court in *Dye v. Choctaw Casino of Pocola, Oklahoma,* No. 104,737, 2009 OK 52, 230 P.3d 507. The meaning of the phrase "court of competent jurisdiction" as used in the compact is also a pivotal issue in the *Dye* case. This Court denied the motion, noting the related *Dye* case, and assigned the appeal to the Court of Civil Appeals. Thereafter, this Court received a certified question as to whether the district court in Rogers County, Oklahoma, is a "court of competent jurisdiction" as that phrase is used in the tribal gaming compact between the Cherokee Nation and the State of Oklahoma in *Cossey v. Cherokee Nation Enterprises, LLC,* No. 105,-300. We withdrew this case from assignment to the Court of Civil Appeals.

---

2. Class III gaming is high-stakes casino-style gambling such as electronic games of chance, slot machines and banking card games. 25 U.S.C. § 2703(8); 3A O.S.Supp.2004, § 281, Part 3(5); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 48 n. 1, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

3. The Tribe duly executed the compact and submitted it to the Secretary of the Interior for approval. The Secretary of the Interior did not approve the compact. The compact was considered approved forty-five days after its submission, 25 U.S.C. § 2710(d)(7)(C), and became effective February 9, 2005, the date notice was published in the Federal Register. 70 FR 6903.

4. There are no allegations that Dorothy Griffith is a member of the Choctaw Nation or that she is subject to tribal regulation as a tribal member.

5. In Part 6, the compact sets forth a pre-judicial procedure similar to that in the state's statutory regime for governmental tort claims. The pre-judicial procedure requires a tort claimant to give notice of the claim to the Indian tribe and its enterprise as a prerequisite to filing a judicial proceeding. If the tribe or the enterprise does not act upon the notice, the tort claim is deemed denied. Upon denial of the claim, the claimant may seek a judicial remedy.

¶6 We recently handed down our opinion in *Cossey v. Cherokee Nation Enterprises, LLC,* 2009 OK 6, 212 P.3d 447, (mandate issued June 11, 2009), holding that the state district court is a court of competent jurisdiction as that phrase is used in the Cherokee Nation's tribal gaming compact. Today, in separate opinions in this case and in the related case of *Dye v. Choctaw Casino of Pocola, Oklahoma,* 2009 OK 52, 230 P.3d 507 we determine that Oklahoma district courts are courts of competent jurisdiction as that phrase is used in Oklahoma's statutory model tribal gaming compact and therefore the state courts may exercise jurisdiction over the tort claims against the Choctaw Nation and its casino in Pocola, Oklahoma.

## II. Standard of Review

¶7 A compact is defined as "an interstate [intergovernmental] agreement entered into to handle a particular problem or task." Webster's New International Dictionary 461 (3rd ed.1961). The Tribe urges that the compact is a purely private contractual matter. However, the Model Tribal Gaming Compact may not be viewed as an ordinary private contract because it is a voter-approved statute codified in the Oklahoma Statutes. The compact is public law and must be interpreted by use of canons of statutory construction. Statutory construction is a question of law which we review *de novo,* without deference to the lower court. *Twin Hills Golf & Country Club, Inc. v. Town of Forest Park,* 2005 OK 71, ¶5, 123 P.3d 5, 6.

## III. The Indian Gaming Regulatory Act (IGRA)

¶8 In 1987, the United States Supreme Court decided that an Indian tribe may oper-

ate bingo games on an Indian reservation located in a state that permits gaming for any purpose and that state law does not apply to bingo games played predominantly by non-Indians coming onto the Indian reservation. *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). The *Cabazon* ruling impelled Congress to legislate in the area. Senate Report No. 100–446, *reprinted in* 1988 U.S.C.C.A.N. 3071 (S.Rep. No. 100–446).

¶9 Congress had considered the problems and benefits of Indian gaming in committee hearings for at least three years before *Cabazon.* Congress enacted Public Law 100–446, finding that gaming was a means of economic development for the tribes that would promote tribal self-sufficiency and strengthened tribal governments. 102 Stat. 2467 (1988). In Public Law 100–446, Congress legalized gaming in Indian country[6] and provided a statutory framework for regulating gaming in Indian country in IGRA.[7]

¶10 Congress attempted to balance the federal, tribal and state interests in Indian gaming through a system of joint regulation in IGRA.[8] IGRA established three classes of Indian gaming. *Id.* § 2703(6), (7) and (8). As to class I gaming (social games with prizes of minimal value and tribal ceremonial or celebrating games), tribal regulation is exclusive. *Id.* § 2710(a). As to class II gaming (bingo games played with cards, pull-tabs, lotto, punch boards and other games similar to bingo games played with cards), tribal regulation is subject to approval and oversight of the National Indian Gaming Commission. *Id.* § 2710(b). As to class III

---

**6.** 18 U.S.C. § 1166 legalizes Indian-country gaming conducted in compliance with IGRA; imposes state gambling law, including the licensing, regulation, or prohibition of gambling, upon any other Indian-country gambling in the same manner and to the same extent elsewhere in the state; and places jurisdiction with the United States to prosecute violations of the state gambling laws unless the Indian tribe consents to state jurisdiction. 18 U.S.C. §§ 1167 and 1168 criminalize thefts from Indian casinos.

**7.** Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2722 (1988).

**8.** IGRA provided a statutory basis for the operation and regulation of class III gaming by Indian tribes and for the adoption of federal standards for class II gaming on Indian lands, 25 U.S.C. § 2702; created the National Indian Gaming Commission within the U.S. Department of Interior, *id.* § 2704, to monitor class II gaming operations and to approve tribal ordinances and tribal management contracts for class II and class III gaming, *id.* § 2706; and established a tribal-state compact system to regulate class III gaming. *Id.* § 2710.

gaming (all gambling not included in class I or class II gaming), tribal regulation is subject to the terms of an agreement between the tribe and the state, a tribal-state compact. *Id.* § 2710(d).

¶ 11 In creating the tribal-state compact system and authorizing state regulation of gambling in Indian country, IGRA does not specifically address the subjects of damages to members of the public that may be caused by wrongful activity of Indian tribes and the judicial relief against the tribes. Instead, IGRA specifically authorizes the tribes and states to compact as to "any other subjects that are directly or indirectly related to the operation of gaming activities." *Id.* § 2710(d)(3)(C)(vii). Tribes and states may allocate the applicable law and forum for

adjudication of patron tort claims. *Id.* § 2710(d)(3)(C)(i), (ii).

## IV. The State–Tribal Gaming Act and The Model Tribal Gaming Compact

■ ¶ 12 In 1988, the Oklahoma Legislature authorized the Governor to negotiate and enter into cooperative agreements with federally recognized Indian tribes in furtherance of federal policy and state-tribal relations, subject to approval by a legislative Joint Committee on State–Tribal Relations.[9] At that time, Oklahoma permitted pari-mutuel wagering on horse races. Our governors negotiated and entered into off-track wagering compacts with numerous Indian tribes.[10] The compacts are filed with the Oklahoma Secretary of the State as required by law.[11]

**9.** 1988 Okla. Sess. Laws, ch. 160 (codified at 74 O.S.Supp.1988, §§ 1221–1222). In 1989, the Oklahoma Legislature amended § 1221 to also authorize political subdivisions to enter into agreements with the tribes on subjects of mutual interest such as law enforcement. 1989 Okla. Sess. Laws, ch. 296, § 1. In 1991, the Legislature required cooperative agreements, upon approval by the Joint Committee on State–Tribal Relations, to be filed with the Secretary of State. 1991 Okla. Sess. Laws, ch. 202, § 2 (codified at 74 O.S.1991, § 1221(E)). In 1993, the Legislature provided for the Oklahoma State Bureau of Investigation to monitor any Indian gaming compacts approved under §§ 1221–1222. 1993 Okla. Sess. Laws, ch. 305, § 1 (codified at 74 O.S.Supp.1993, § 1223). Further, in 1992, the Oklahoma Legislature authorized the Governor to enter into cigarette and tobacco products tax compacts with the tribes. 1992 Okla. Sess. Laws, ch. 339 (codified at 68 O.S.Supp.1992, § 34).

**10.** The U.S. Supreme Court has not determined where the authority lies within a state's governmental framework to compact with Indian tribes. It has ruled that where the involved federal statute is silent on the issue of state authority, that issue will be determined under state law. *See Washington v. Confederated Bands and Tribes of the Yakima Indian Nations,* 439 U.S. 463, 493 n. 39, 99 S.Ct. 740, 757 n. 39, 58 L.Ed.2d 740 (1979); *West Virginia ex rel. Dyer v. Sims,* 341 U.S. 22, 28, 71 S.Ct. 557, 560, 95 L.Ed. 713 (1951). IGRA is silent as to where state authority lies to enter into gaming compacts with Indian tribes.

**11.** We note that several of the off-track wagering compacts filed with the Oklahoma Secretary of State include a notice-of-tort-claim procedure and authorize a tort claimant to file suit against the tribe only in tribal court. The following

compacts provide that "upon denial of a claim redress must be sought exclusively in Tribe's Courts": 1) Peoria Tribe of Indians filed October 18, 2004, 2) Seneca–Cayuga Tribe filed October 18, 2001, and 3) Absentee Shawnee Tribe filed March 28, 2001. The following compacts, in similar language, provide that "upon denial of a claim redress must be sought exclusively in Nation's Courts": 1) Chickasaw Nation filed August 2, 2004, 2) Ponca Tribe filed October 19, 2001, and 3) Kaw Nation filed March 28, 2001. Two compacts provide for suit in the Court of Indian Offenses created in the Code of Federal Regulations and referred to as CFR courts. The compact with the Quapaw Tribe filed January 29, 2002, provides: "Such notices shall explain that upon denial of a claim redress must be sought exclusively against the operator in C.F.R. Court. Such notices will also indicate that the Quapaw Tribe of Oklahoma does not in any way agree to be amenable to suit for any reason." The compact with Seminole Nation filed March 28, 2001, provides: "No action for any cause arising from personal injury, property damage ... shall be maintained unless valid notice is given and the action is commenced in a Tribe's CFR court." The compact with the Comanche Tribe filed March 20, 2001, is different. It provides: "Comanche hereby transfers to the State of Oklahoma concurrent civil and criminal jurisdiction, except for taxing authority, to enforce the Act and Rules ... [and any] violation of the laws of the State of Oklahoma, which shall be enforceable in a court of competent jurisdiction."

With the exception of the Comanche compact, these compacts also require public liability insurance which "shall include an endorsement that the insurer shall not invoke tribal sovereign immunity up to the limits of the policy ... [and that] the Tribe explicitly waives its immunity from suit." They also provide that the "compact shall be governed and construed in accordance

74 O.S.2001, § 1221(E). Two compacts with the Tribe in this case, filed with the Oklahoma Secretary of State on December 5, 1996, and March 28, 2001, allow that a tort claim against the Tribe may be filed in a court of competent jurisdiction and also allow a tort claimant to file suit in state district court or Tribal court, at the claimant's option.[12]

¶ 13 In 2004, Oklahoma voters approved casino-style gambling at horse race tracks and in Indian country. The Oklahoma Legislature passed the State–Tribal Gaming Act and sent it to a vote of the people.[13] State Question No. 712, Legislative Referendum No. 335 (codified at 3A O.S.Supp.2004, §§ 261–281)(approved November 2, 2004). The Act sets out standards for the gaming machines and authorizes the Oklahoma Horse Racing Commission to implement and enforce the gaming statutes. 3A O.S.Supp. 2004, § 262. It provides for the regulation and oversight of Indian gaming in accordance with the model compact. *Id.* §§ 262(F) and 281, Part 5. It also fully sets forth the "Model Tribal Gaming Compact," offering Indian tribes a nearly exclusive right to operate the covered gaming machines without substantial competition from nontribal entities. *Id.* § 281.

¶ 14 The model compact is offered, all or none, to the Indian tribes of Oklahoma, which if accepted, constitutes the gaming compact between this state and the accepting tribe for purposes of IGRA without any further action on behalf of the State of Oklahoma. *Id.* § 280. The model compact consists of Part 1 through Part 16. The model compact sets the fee to be paid to the state by the Indian tribe for the "substantial exclusivity and, consistent with the goals of IGRA, special opportunities for tribal economic opportunity through gaming within the external boundaries of Oklahoma in respect to the covered games."[14] It defines the games that the tribes may offer to casino patrons as a means of generating revenue as authorized by IGRA,[15] places responsibility for operation and regulation of the casino with the tribe,[16] and places the oversight and monitoring of class III gaming with the Office of State Finance as the state compliance agency (SCA).[17]

---

with the laws of the United States, the State, and the laws of the Nation [or Tribe], whichever are applicable.

Our research does not reveal that any of these compacts has been the subject of a suit in state court. We note these compacts only for the historical value.

**12.** Both of the off-track wagering compacts of the Tribe include a notice-of-tort-claim procedure for the patrons as a prerequisite to filing suit: "No action for any cause arising from personal injury, property damage, or patron gaming dispute shall be maintained unless valid notice has been given and the action is commenced in a court of competent jurisdiction within 180 days after denial of the claim as set forth herein." Both provide that "upon exhaustion of any claim against the Tribe properly filed as provided above, the claimant, may, at his or her option, file an action in either the state district court, or the Tribal Court on the claim." We note these compacts only for the historical value.

**13.** The voters were informed of the contents of the State–Tribal Gaming Act in the ballot title. The Ballot Title in the legislative referendum proposing enactment of State–Tribal Gaming Act reads:

This measure creates the State–Tribal Gaming Act. It would allow some types of gaming machines at some horse race tracks in this state. The Oklahoma Horse Racing Commission would oversee the new types of gaming machines. It would require that a portion of the money wagered on such gaming be paid to the state. Some of the money would go to purses for horse races. Some of the money would go to the horse race tracks. The measure also provides a model compact which Indian tribes may enter into and then operate such gaming machines on Indian lands. The model compact provides regulatory controls for the gaming authorized by the compact. The Office of State Finance would have the authority to oversee this gaming by the tribes. The state's portion of the money from the gaming authorized by this act would go for treatment of compulsive gambling disorders, to the Education Reform Revolving Fund and for college scholarships.

2004 Okla.Sess.Laws, ch. 316.

**14.** 3A O.S.Supp.2004, § 281, Part 11(A).

**15.** *Id.* § 281, Part 3.

**16.** *Id.* § 281, Parts 4 & 5.

**17.** *Id.* § 281, Part 8 (entitled STATE MONITORING OF COMPACT, which authorizes state oversight of tribal regulation of class III gaming for compliance with state law as well as federal or tribal law). The term "monitoring" is used in the compact similar to IGRA's use of that term in

¶ 15 The model compact recites the tribe's limited consent to suit for patron tort claims, mandates liability insurance coverage for the benefit of the public, prohibits the liability insurer from asserting tribal immunity, prescribes the procedure for casino patrons to claim damages, and expresses the tribe's consent to suit.[18] As to tort claims in Part 6(A), the compact requires the tribal enterprise [19] to maintain public liability insurance to cover tort claims in the minimum amounts set out in the compact or specified in the Governmental Tort Claims Act.[20] Part 6(A) prescribes a procedure for seeking damages for tort claims against the enterprise. That procedure begins with notice of the tort claim to the TCA or the tribal enterprise for investigation and approval or denial; and if the tribe or tribal agency denies the claim, the claimant is authorized to file a judicial proceeding to recover damages not to exceed the limits of the mandated public liability insurance coverage. Part 6(A) requires the enterprise to make pamphlets available to the casino patrons explaining the tort claim procedure and also explaining that the procedure is exclusive and that if it is not followed, the claim shall be forever barred.[21]

describing the powers of the National Indian Gaming Commission that regulates and oversees the tribal regulation of class II gaming. 25 U.S.C. § 2706(b).

18. *Id.* § 281, Part 6(A) (relating to tort claims), Part 6(B) (relating to prize claims), and Part 6(C) (relating to suits against the tribe or tribal agency).

19. *Id.* § 281, Part 3(13)(defining the tribal enterprise as the tribe or tribal agency).

20. The state statutory regime codified at 51 O.S. 2001, §§ 151–170 waives the state's and its political subdivisions' governmental immunity for tort claims and allows the state to be sued in a court of competent jurisdiction. *Id.* § 152(1).

21. Section 281, Part 6(A) of the model compact reads:

A. Tort Claims. The enterprise shall ensure that patrons of a facility are afforded due process in seeking and receiving just and reasonable compensation for a tort claim for personal injury or property damage against the enterprise arising out of incidents occurring at a facility, hereinafter "tort claim", as follows:

1. During the term of this Compact, the enterprise shall maintain public liability insurance for the express purpose of covering and satisfying tort claims. The insurance shall have liability limits of not less than Two Hundred Fifty Thousand Dollars ($250,000.00) for any one person and Two Million Dollars ($2,000,000.00) for any one occurrence for personal injury, and One Million Dollars ($1,000,000.00) for any one occurrence for property damage, hereinafter the "limit of liability", or the corresponding limits under the Governmental Tort Claims Act, whichever is greater. No tort claim shall be paid, or be the subject of any award, in excess of the limit of liability;

2. The **tribe consents to suit** on a limited basis with respect to tort claims subject to the limitations set forth in this subsection and subsection C of this Part. No **consents to suit** with respect to tort claims, or as to any other claims against the tribe shall be deemed to have been made under this Compact, except as provided in subsections B and C of this Part;

3. The enterprise's insurance policy shall include an endorsement providing that the insurer may not invoke tribal sovereign immunity in connection with any claim made within the limit of liability if the claim complies with the limited consent provisions of subsection C of this Part. Copies of all such insurance policies shall be forwarded to the SCA;

4. Any patron having a tort claim shall file a written tort claim notice by delivery to the enterprise or the TCA. The date the tort claim notice is filed with the enterprise or the TCA shall be deemed the official date of filing the tort claim notice. The tort claim notice shall be filed within one (1) year of the date of the event which allegedly caused the claimed loss. Failure to file the tort claim notice during such period of time shall forever bar such tort claim; provided that a tort claim notice filed with the enterprise or the TCA more than ninety (90) days, but within one (1) year, after the event shall be deemed to be timely filed, but any judgment thereon shall be reduced by ten percent (10%).

5. If the tort claim notice is filed with the TCA, the TCA shall forward a copy of the tort claim to the enterprise and the SCA within forty-eight (48) hours of filing, and if the tort claim notice is filed with the enterprise, the enterprise shall forward a copy of the tort claim to the TCA and the SCA within forty-eight (48) hours of filing;

6. The tort claim notice shall state the date, time, place and circumstances of the incident upon which the tort claim is based, the identity of any persons known to have information regarding the incident, including employees or others involved in or who witnessed the incident, the amount of compensation and the basis for said relief; the name, address and telephone number of the claimant, and the name, address and telephone number of any representative authorized to act or settle the claim on behalf of the claimant;

7. All tort claim notices shall be signed by the claimant. The rules and regulations may

¶ 16 As to suits on tort claims, the tort claimant [22] is permitted to maintain a judicial proceeding for any cause arising from a tort claim subject to the limitations in Part 6(C), and the tribe [23] consents to suit subject to the monetary limits and procedural conditions in Part 6(A) and Part 6(C). The tribe also consents to suit against the enterprise in a court of competent jurisdiction,[24] the language at issue here.[25] In other words, the

additionally require that the tort claim notices be signed under oath. The rules and regulations [TCA, rules and regulations as defined in Part 3(22)] may also require that as a condition of prosecuting tort claims, the claimant shall appear to be interviewed or deposed at least once under reasonable circumstances, which shall include the attendance of the claimant's legal counsel if requested; provided that the enterprise shall afford claimant at least thirty (30) days' written notice of the interview or deposition; and provided further that the claimant's failure to appear without cause for any interview or deposition properly noticed pursuant to this paragraph shall be deemed a voluntary withdrawal of the tort claim;

8. The enterprise shall promptly review, investigate, and make a determination regarding the tort claim. Any portion of a tort claim which is unresolved shall be deemed denied if the enterprise fails to notify the claimant in writing of its approval within ninety (90) days of the filing date, unless the parties by written agreement extend the date by which a denial shall be deemed issued if no other action is taken. Each extension shall be for no more than ninety (90) days, but there shall be no limit on the number of written agreements for extensions, provided that no written agreement for extension shall be valid unless signed by the claimant and an authorized representative of the enterprise. The claimant and the enterprise may continue attempts to settle a claim beyond an extended date; provided, settlement negotiations shall not extend the date of denial in the absence of a written agreement for extension as required by this paragraph; ·

9. A judicial proceeding for any cause arising from a tort claim may be maintained in accordance with and subject to the limitations of subsection C of this Part only if the following requirements have been met:

a. the claimant has followed all procedures required by this Part, including, without limitation, the delivery of a valid and timely written tort claim notice to the enterprise,

b. the enterprise has denied the tort claim, and

c. the claimant has filed the judicial proceeding no later than the one-hundred-eightieth day after denial of the claim by the enterprise; provided, that neither the claimant nor the enterprise may agree to extend the time to commence a judicial proceeding; and

10. Notices explaining the procedure and time limitations with respect to making a tort claim shall be prominently posted in the facility. Such notices shall explain the method and places for making a tort claim, that this procedure is the exclusive method of making a tort claim, and that claims that do not follow these procedures shall be forever barred. The enterprise shall make pamphlets containing the requirements in this subsection readily available to all patrons of the facility and shall provide such pamphlets to a claimant within five (5) days of the filing of a claim.

(Bold Added.)

22. *Id.* § 281, Part 6(A)(9).

23. *Id.* § 281, Part 6(A)(2).

24. *Id.* § 281, Part 6(C).

25. Section 281, Part 6(C) applicable to tort claims reads:

C. Limited Consent to Suit for Tort Claims and Prize Claims. The tribe consents to suit against the enterprise in **a court of competent jurisdiction** with respect to a tort claim or prize claim if all requirements of paragraph 9 of subsection A or all requirements of paragraph 11 of subsection B of this Part have been met; provided that such consent shall be subject to the following additional conditions and limitations:

1. For tort claims, **consent to suit** is granted only to the extent such claim or any award or judgment rendered thereon does not exceed the limit of liability. Under no circumstances shall any **consent to suit** be effective as to any award which exceeds such applicable amounts. This **consent** shall only extend to the patron actually claiming to have been injured. A tort claim shall not be assignable. In the event any assignment of the tort claim is made in violation of this Compact, or any person other than the patron claiming the injury becomes a party to any action hereunder, this **consent** shall be deemed revoked for all purposes. Notwithstanding the foregoing, **consent to suit** shall not be revoked if an action on a tort claim is filed by (i) a court appointed representative of a claimant's estate, (ii) an indispensable party, or (iii) a ·health provider or other party subrogated to the claimant's rights by virtue of any insurance policy; provided, that nothing herein is intended to, or shall constitute a **consent to suit** against the enterprise as to such party except to the extent such party's claim is:

a. in lieu of and identical to the claim that would have been made by the claimant directly but for the appointment of said representative or indispensable party, and partic-

tribe consents to suit two times. The first time the tribe consents to suit without any mention of a court in Part 6(A)(2), and the second time it consents to suit against its enterprise with mention of a court of competent jurisdiction in Part 6(C). Even if we were to find that our state courts are not competent to entertain a suit against the tribe's enterprise in Part 6(C), the tribe has also consented to be sued in Part 6(A)(2). We find no part in the compact where the tribe consents to suit "in tribal court only."

¶ 17 The model compact unmistakably gives the casino patron the right to recover damages on tort claims against the Indian tribe and against the tribe's enterprise. The compact imposes specific conditions and limits on the right: 1) it limits the amount of damages for which the tribe and/or the enterprise will be liable up to the monetary limits of Oklahoma's governmental tort claims law, 2) it restricts enforcement of a damages award to the liability insurance and prohibits the insurer from asserting tribal immunity, 3) it prescribes special notice-of-claim procedures for recovery of damages parallel to the state governmental tort claims statutory procedure, 4) it authorizes a judicial remedy to recover tort damages, and 5) it provides the tribe's clear and express consent to suit for damages. The compact does not, however, restrict the casino patron to tort damages under tribal law nor does it limit the casino patron to suit against the tribe or its enterprise in tribal court.

¶ 18 Although there is no language in the model compact making tribal law or tribal courts the exclusive protection for a wrongfully injured casino patron, the Tribe takes the position that Part 9 limits its consent to suit to the tribal courts only. Part 9 reads: "This compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction." Part 9 expresses intent not to "alter" whatever court has adjudicatory jurisdiction, but it does nothing to define a court of competent jurisdiction.[26]

¶ 19 The model compact governs Indian-country gaming activities by consent of the Indian tribe. It acknowledges that the "tribe is a federally recognized tribal government possessing sovereign powers and the rights of self-government,"[27] that the "state and the tribe maintain a government-to-government relationship, and that this Compact will help foster mutual respect and understanding among Indians and non-Indians."[28] Nothing in the compact provides that patron tort claims are to be adjudicated only in tribal court. Had that been the intent of the tribes and the state, the simple words "in tribal court only" could have been included in the compact.

¶ 20 We have carefully perused the model compact and studied the provisions in Part 6 pertaining to a casino patron's tort claim against the tribe. We conclude that the Tribe clearly and unequivocally consented to be sued for tort damages by a casino patron, whether suit be brought in state court, federal court, or tribal court.

## V. "Court of Competent Jurisdiction"

¶ 21 Griffith took a position that the state district court is the "court of competent jurisdiction" by default because this is not a federal-question claim, the Tribe is not a citizen for purposes of diversity of citizenship, and the Tribe had no tribal courts when the statutory compact was negotiated, passed by the Oklahoma Legislature, approved by a vote of the people, signed by the Tribe, and/or published by the United States Secretary of the Interior. The Tribe, on the other

---

ipation of such other party is in lieu of and not in addition to pursuit of the claim by the patron, and

b. the claim of such other party would have been subject to a **consent to suit** hereunder if it had been made by the claimant directly; and

. . . .

 (Bold added.)

**26.** The state court adjudicatory power is fixed by our state constitution, Okla. Const. art. VII, sub-

ject to our federal constitution, Okla. Const. art. I, § 1, and protected from legislative encroachment by our separation of powers rule, Okla. Const. art. IV, § 1. Generally a state statute such as the model compact cannot alter the adjudicatory jurisdiction constitutionally vested in our state courts nor can a state statute alter federal or tribal adjudicatory powers.

**27.** 3A O.S.Supp.2004, § 281, Part 2(1).

**28.** *Id.* § 281, Part 2(3).

hand, took an unsettled position that exclusive jurisdiction over Indian-country arising torts was vested in the tribal courts at the time the compact was executed, the compact preserved the tribal court's exclusive jurisdiction, and therefore, the consent to suit in a court of competent jurisdiction in the compact is consent to suit in tribal court only.

¶ 22 The Tribe argued that this Court has already recognized that a controversy such as the instant one lies exclusively in tribal court. The Tribe relies on an unpublished order of this Court in *Muskogee (Creek) Nation Gaming Commission v. The Honorable Mary Fitzgerald, District Judge*, No. 104,-726. In that original action, the Creek Nation asked this Court to prohibit the state district court judge from proceeding further in *Manwarring v. Muskogee (Creek) Nation Gaming Commission*, No. CJ–207–745, Tulsa County District Court. This Court assumed original jurisdiction and issued the writ in an unpublished order. An unpublished order has no precedential value. Okla.Sup.Ct. R.1.200(b)(1) and (7), 12 O.S.2001, ch. 15, app. I (Disposition of a case without a formal published opinion means that the Court did not believe the case involved any new point of law making the decision of value as precedent.). The non-precedential order in the *Muskogee (Creek) Nation Gaming Commission* case settled an issue for the involved parties only. An unpublished order is the law of the case but not the law of the State.

¶ 23 The Tribe also made a very tenuous argument that the meaning of the words "court of competent jurisdiction" "*are not for this Court to decide*" because Part 12 of the compact expressly provides that interpretation issues shall be decided in arbitration with review in the federal courts. Part 12 of the compact deals with resolution of disputes between the parties-the tribe and the state. Part 12(2) is the "parties consent to the jurisdiction of such arbitration [American Arbitration Association] forum and court [feder-

al district court] for such limited purposes and no other, and each waives immunity with respect thereto." Without ruling, we express doubt that this is a dispute contemplated by Part 12 of the compact.

¶ 24 The phrase "court of competent jurisdiction" as used in federal statutes has long been construed to mean federal and state courts, *Blackburn v. Portland Gold Mining Co.*, 175 U.S. 571, 20 S.Ct. 222, 44 L.Ed. 276 (1900), where the statute did not "in express language prescribe either a Federal court or a state court, and did not provide for exclusive or concurrent jurisdiction." *Shoshone Mining Co. v. Rutter*, 177 U.S. 505, 506, 20 S.Ct. 726, 44 L.Ed. 864 (1900). State jurisprudence is in accord. *Lewis v. Sac and Fox Tribe of Okla. Housing Authority*, 1994 OK 20, ¶ 15, 896 P.2d 503, 509–510.

 ¶ 25 Federal, state, and even tribal laws utilize the phrase "court of competent jurisdiction."[29] Under basic rules of federal statutory construction, where the statute does not define its terms, they must be given their ordinary and natural meaning, *Smith v. U.S.*, 508 U.S. 223, 228, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993); and if the phrase is not commonly understood, the court will inquire into the contemporaneous understanding, *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 759, 100 S.Ct. 2455, 2460, 65 L.Ed.2d 488 (1980), or the common law meaning of the phrase. *Gilbert v. U.S.*, 370 U.S. 650, 655, 82 S.Ct. 1399, 1402, 8 L.Ed.2d 750 (1962).

 ¶ 26 We recognize that as a matter of federal law, tribal immunity from suit in state court is not subject to diminution by the states and that an Indian tribe is subject to suit where Congress has authorized the suit or the tribe has waived immunity. *Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 756, 118 S.Ct. 1700, 1703, 140 L.Ed.2d 981 (1998).

---

**29.** The federal statute, 15 U.S.C. § 3007 (1978), provides for jurisdiction over a civil action involving interstate horse racing in the federal district court in the host state or the off-track state concurrent with that of any state **court of competent jurisdiction** located in the host state or the off-track state. The Okla. Const. art. VIII, § 1 requires that elected state officers shall automati-

cally be suspended upon their being declared guilty of a felony by a **court of competent jurisdiction.** And, the Constitution of the Choctaw Nation (July 9, 1983), art. VI, § 5, provides that "[n]o person who has been convicted of a felony by a **court of competent jurisdiction** shall be eligible to hold any elective or appointive office in the Choctaw Nation." (Bold added.)

We also recognize that a tribe's waiver of immunity to suit in state court does not require specific or magic words-an arbitration provision together with a choice-of-law provision may constitute an unequivocal waiver of tribal immunity to suit in state court. *C & L Enterprises, Inc. v. Citizens Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 422, 121 S.Ct. 1589, 1595–1596, 149 L.Ed.2d 623 (2001). Contrary to the no-magic-words ruling in *C & L Enterprises*, the Tribe insists that its consent to suit in the compact is not consent to suit in state court unless it literally uses the words "consents to suit in state court." We conclude that the state district court is a court of competent jurisdiction as that term is used in the Model Tribal Gaming Compact codified at 3A O.S. Supp.2004, § 281. Our conclusion does not change, diminish, or expand the jurisdiction of tribal courts nor does it take away the right of a tort claimant to select the forum-state, federal, or tribal-to file a tort action.

## VI. Summary

¶ 27 In summary, the Tribe claims that "in a court of competent jurisdiction" means "in tribal court only." But the model compact does not say "in tribal court only." The compact says the "tribe consents to suit . . . with respect to tort claims" and the "tribe consents to suit against the enterprise in a court of competent jurisdiction with respect to a tort claim." The language in the compact could have easily restricted casino patrons' tort remedy to tribal courts, if the tribal government representatives and the state government representatives who proposed the state-tribal gaming legislation directed that those words be used in the measure. "In tribal court only" could have been typed on the keyboard by whoever typed the proposed compact. It is that simple. The language in other tribal compacts have specified that tort actions against the tribe may be filed in tribal court only. We reject the Tribe's claim that the proponents of the state-tribal gaming legislation really intended to waive tribal immunity "in tribal court only" when the compact does not disclose that intent.

¶ 28 We hold that Oklahoma district courts are "courts of competent jurisdiction" as that phrase is used in the Model Tribal Gaming Compact codified at 3A O.S. Supp.2004, § 281. Nothing in this opinion should be taken as a holding that a tribal court is not a "court of competent jurisdiction" or should be taken as eliminating the tribal court as a forum available to a tort claimant if the claimant chooses to file suit in tribal court.

**DISMISSAL ORDER OF THE DISTRICT COURT REVERSED; CAUSE REMANDED FOR FURTHER PROCEEDINGS.**

TAYLOR, V.C.J. (by separate writing), and OPALA (by separate writing), WATT, WINCHESTER, and COLBERT, JJ., concur.

KAUGER, J., (by separate writing) concurs in part and dissents in part.

EDMONDSON, C.J., and HARGRAVE and REIF (by separate writing), JJ., dissent.

TAYLOR, V.C.J., concurring:

¶ 1 Today's *per curiam* opinion holds that our district courts are courts of competent jurisdiction in the state Model Tribal Gaming Compact (model compact), 3A O.S.Supp.2004, § 281. Our holding is rested upon the federal Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2722, the state statutory model compact, and basic rules of statutory construction. I join fully in our holding, and I concur fully in today's *per curiam* opinion. I write separately to direct attention to the compact language requiring compliance with state law in the operation of Indian gambling casinos and to emphasize the conformity of today's opinion and our recent opinion in *Cossey v. Cherokee Nation Enterprises, LLC*, 2009 OK 6, 212 P.3d 447 (mandate issued June 11, 2009).

¶ 2 The model compact, at Part 8, provides that the operation of a class III gaming casino in Indian country must comply with state law. Part 8 delineates the oversight and monitoring duties of the Office of State Finance as the state compliance agent (SCA), requiring the SCA to give written notice of any suspected "violation of this Compact or

of law" to the tribal compliance officer (TCA), model compact at Part 8(A), and to report any violations of "federal, **state,** or tribal laws, the rules and regulations, or this Compact" to the TCA. *Id.* at Part 8(C)(bold added). Part 8 limits the state's oversight by withholding authority from the state "to regulate the tribe's government, including the TCA, or to interfere with the tribe's selection of its governmental officers." *Id.* at Part 8(D). The importance of Part 8 here is that it plainly requires Indian tribes to comply with state law in operating their gambling casinos, except when state law interferes with tribal self-government. In my view, Part 8 is strong support for including state district courts within the meaning of "courts of competent jurisdiction."

¶ 3 Also, our opinion in *Cossey v. Cherokee Nation Enterprises, LLC* compels today's holding. Notwithstanding the many factors that distinguish *Cossey* from the instant case, the primary issue in *Cossey* was the same as the issue here-whether the state district court is a court of competent jurisdiction to entertain an Indian casino patron's tort claim against an Indian tribe under the model compact. *Cossey* analyzed federal and state jurisprudence in assigning meaning to "court of competent jurisprudence" in the model compact[1] and reached the same conclusion that today's *per curiam* opinion reached through its statutory construction analysis.

1. *Cossey* followed 1) state jurisprudence for the meaning of "court of competent jurisdiction," relying on *Ex Parte Plaistridge,* 1918 OK 352, 173 P. 646, and *Ex Parte Justus,* 1909 OK CR 132, 3 Okla.Crim. 111, 104 P. 933; 2) federal jurisprudence for the notion of "dual sovereignty," relying on *Tafflin v. Levitt,* 493 U.S. 455, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990), and *Nevada v. Hicks,* 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) ("Dual sovereignty" recognizes that state courts have inherent authority and concurrent jurisdiction with the federal courts to adjudicate claims arising under federal law in the absence of specific congressional enactment to the contrary.); and 3) federal Indian jurisprudence for the prohibition against state interference with tribal self-governance and internal affairs, including such cases as *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), *Strate v. A-1 Contractors,* 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), *Nevada v. Hicks,* 533 U.S. 353, 121 S.Ct. 2304,

OPALA, J., concurring

¶ 1 I write in concurrence to support the court's construction of the key phrase "the court of competent jurisdiction."

¶ 2 The claim we deal with in this cause—a common law tort—**was created by the cooperative effort of three separate levels of governmental power:** (1) the **federal sovereign's** authorization of the compact[1] that created the claim before us and by (2) the **State of Oklahoma** entering into a **federally-authorized compact**[2] with (3) the Choctaw Nation. It is in light of the tripartite joinder of sovereign powers that we must interpret the key phrase "a court of competent jurisdiction."[3] We do so here **by not excluding any one** of the three birth-giving participants. Instead, we **acknowledge** that each of them, in its own court, may assume original jurisdiction over the casino patron's tort claim. The Nation has agreed to share jurisdiction with the other two sovereigns, the State and the federal government. The casino patron's tort claim is not, and cannot be, denominated as Indian law.[4] Our interpretation opens the door and keeps it widely open until one or more of the participating sovereigns should decline the opportunity to extend its adjudicative power over a casino patron's cause of action. Inasmuch as the casino patron's tort claim is a product created by a legal cooperation among the three sovereigns, the construction to be placed on the key phrase "the court of competent juris-

150 L.Ed.2d 398(2001), and *Plains Commerce Bank v. Long Family Land and Cattle Company,* — U.S. —, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008).

1. 25 U.S.C. § 2710(d).

2. 3A O.S. Supp.2004, § 381.

3. "This Compact shall not alter tribal, federal or state civil and criminal jurisdiction". We are not concerned here about pre-existing federal law of Indian country but about the new laws created by Choctaw Nation/Oklahoma compact.

4. *U.S. v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (holding that absent an ambiguity or a result that is at odds with a statute's purposes, statutory provisions must be interpreted according to their plain meaning).

diction" must extend equal treatment to each of these participating governments. The compact's textual impact plainly contemplates that jurisdiction over a casino patron's tort claim is to be shared. See Parts 6 and 9.[5] Over time, if all three sovereigns will continue to participate in the adjudicative process by entertaining the claims in their courts, a harmonizing jurisprudence will doubtless evolve for the three forensic systems to remain consistent and parallel.

¶3 A casino patron's tort claim for injury sustained on tribal casino's premises is governed neither by tribal law nor by Oklahoma state law. Rather, it is the product of compact-agreed terms of liability that may be imposed. A compact is defined as "an interstate [intergovernmental] **agreement entered into to handle a particular** problem or **task.**"[6] A claim crafted pursuant to compact law—the law agreed upon by the parties to the compact-authorized negotiations—should be enforceable by the signatory parties, the state and the tribe as well as by the federal courts. In the absence of a definition different from that which stands crafted by the text for the key term "the court of competent jurisdiction", the phrase used by the compact should include a proper court of all three powers which participated in creating the compact.

KAUGER, J., concurring in part/dissenting in part:

¶1 My analysis of the core issues remains unchanged from what I expressed in *Cossey v. Cherokee Nation Enterprises, LLC.,* 2009 OK 6, 212 P.3d 447 (rehearing denied June 11, 2009). I was troubled by two implications in *Cossey.* The writing implied that: 1) tribal courts are not courts of competent jurisdiction; and 2) jurisdiction might depend on whether the casino patron was an Indian or a non-Indian. Today's opinion clearly dispels these concerns, holding that: 1) the casino

patron may select tribal courts as a forum for bringing such a tort claim because a tribal court is "court of competent jurisdiction;" and 2) recognizing that the plaintiff is a non-Indian, non-tribal member who voluntarily entered onto tribal land to do business, thus subjecting herself to potential tribal court jurisdiction.

¶2 Nevertheless, the majority's analysis of the issues continues to bother me. The majority opinion states: "[w]e conclude that the Tribe clearly and unequivocally consented to be sued for tort damages by a casino patron whether suit be brought in state court, federal court or tribal court." I agree that the first portion of this statement is true, the Tribe clearly and unequivocally consented to be sued for tort damages by a casino patron. It is the remainder of the statement which is unsupported. The crux of this dispute, and the reason for five separate writings in this cause as well as five separate writings in *Cossey,* is that the compact is obviously ambiguous because it *does not clearly and unequivocally* state which court has jurisdiction.

¶3 The majority makes the finding of clarity without supporting evidence. Nevertheless, the Court might have had the opportunity to shed light on this ambiguity. In the companion case of *Dye v. Choctaw Casino of Pocola,* No. 104,737, 2009 OK 52, 230 P.3d 507 also decided today, the State Treasurer, in his capacity as lead State negotiator for the 2004 Model Gaming Compact, filed leave of the Court on May 15, 2008, to file a statement regarding the compact. However, the Court is precluded from considering this statement [whatever it says] because the application was denied and the statement was stricken from the record on May 27, 2008.[1] We are once again faced with the same problem as in *Cossey*—the need to remand the matter to consider extrinsic evidence of the parties' intent.[2]

5. Part 6 sets forth the casino patron's tort claims. Part 9 provides that tribal, federal and state governments retain their respective spheres of civil adjudicative jurisdiction over gaming in Indian country.

6. Webster's New International Dictionary 461 (3rd ed.1961).

1. A copy of the order is *attached* to this writing.

2. Although it was again ignored by the Court, the Governor of Oklahoma and the State Treasurer attached as exhibits to their Amicus Curiae brief filed on March 9, 2009, in *Cossey v. Cherokee Nation Enterprises, LLC.,* 2009 OK 6, 212 P.3d 447 copies of sworn affidavits which indicate

¶ 4 I agree that there is no express, specific language in the model compact making tribal law or tribal courts the exclusive forum for a wrongfully injured casino patron. This leads to the compact's ambiguity. The compact does, however, specifically provide, in Part 9, that "[t]his compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction." Alteration may occur by expansion or contraction. Because Oklahoma is not a P.L. 280 state,[3] I believe that what is clear is that state court jurisdiction has been expanded.

¶ 5 The majority opinion acknowledges that the question of whether exclusive jurisdiction over torts arising on tribal land was vested in tribal courts at the time the compact was executed has not been well-settled. Yet, settling this question is critical to the analysis because of the Part 9 language. Neither the majority in today's opinion nor *Cossey* discusses or analyzes any of the cases which have addressed this issue and unanimously held that the tribal courts have jurisdiction (some negotiated under the compact, some inherent).[4] In addition to side stepping

that they negotiated and signed the compact with the intent that the phrase "a court of competent jurisdiction" was not a provision intended to extend the jurisdiction of State courts. Rather, it was intended to preserve preexisting Tribal court jurisdiction over claims arising in Indian country against Indian Tribes.

3. Public law 83–280 (commonly referred to as Public Law 280 or PL 280) was a transfer of legal authority (jurisdiction) from the federal government to state governments. Some states, including California, were given extensive criminal and civil jurisdiction over tribal lands within the affected states whereas Oklahoma was not given, nor did it assume, equivalent authority to apply or enforce its state civil or criminal laws in Indian country.

4. For example, in *Hatcher v. Harrah's NC Casino Company, LLC.*, 169 N.C.App. 151, 610 S.E.2d 210 (2005), the North Carolina Court of Appeals addressed whether the state courts had subject matter jurisdiction to resolve a dispute between a casino patron who alleged that he won a jackpot and the casino's management company. The compact between the Tribe and the State granted regulatory, criminal jurisdiction to the State, but it did not expressly grant civil jurisdiction to the State with respect to the parties' dispute. The court concluded that the exercise of state court jurisdiction in the action would unduly infringe on the self-governance of the tribe. *See also, Bonnette v. Tunica–Biloxi Indians*, 873 So.2d 1 (La.Ct.App.2003) which recognized that the Tribe *retained* jurisdiction of tort claims of patrons of casinos in a compact which provided that the "full territorial and subject matter jurisdiction" of the Tribe was preserved and that the Tribe would adopt procedures for disposition of tort claims. This conclusion was reached despite the compact also containing a provision which stated that the State and the Tribe had concurrent jurisdiction to fully "ensure the protection of the public," the Tribe and the State. A New Mexico case, *Gallegos v. Pueblo of Tesuque*, 132 N.M. 207, 46 P.3d 668 (2002), dealt with the subject matter jurisdiction of state courts over a tort claim brought by a non-Indian against an Indian Tribe for injuries suffered at the tribe's gaming

facility. At the time of the alleged tort, there was no valid gaming compact in force. The Court held that trial courts of New Mexico lacked jurisdiction in the matter absent a valid agreement between the tribe and the state permitting the state court to hear the matter. A subsequent case, *Doe v. Santa Clara Pueblo*, 141 N.M. 269, 154 P.3d 644, 646–647 (2007) was heard after a valid gaming compact was executed between the Tribe and the State. The compact contained specific language concerning tort claims and jurisdiction The Court held both that the compact created a concurrent State–Tribal jurisdiction for personal injury tort claims, by agreement of the parties, and that IGRA permitted such a negotiation and outcome. *Diepenbrock v. Merkel*, 33 Kan.App.2d 97, 103, 97 P.3d 1063 (Ct.App.2004) considers subject matter jurisdiction for a wrongful death action. The deceased died of a heart attack suffered on tribal land owned in fee by the tribe. The tribal gaming compact gives the tribe civil jurisdiction for tort matters relating to Class III gaming on their reservation. The Court spoke to the linchpin of the matter, at p. 1067, recognizing that "[i]t would undermine the authority of the tribal courts over reservation affairs and hence would infringe on the right of the Prairie Band Potawatomi Nation to govern themselves if jurisdiction did not reside in the tribal courts in this case...." In *Kizis v. Morse Diesel International*, 260 Conn. 46, 794 A.2d 498 (2002) the Connecticut Supreme Court addressed the issue of jurisdiction in a case involving a patron of a tribal casino who brought a negligence action against the Tribe's employees seeking damages for personal injuries sustained at the casino. The Court held that subject matter jurisdiction was lacking in state court and that the proper forum was the Mohegan Gaming Disputes Court. This result was reached after the Court considered the express language of the compact, the fact that the tribal constitution provided a forum and mechanism to redress the patron's injuries and IGRA permitted such a result. In *Gaming Corporation of America v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir.1996), a case from the 8th Circuit Court of Appeals involving a lawsuit between a tribal casino management company and a law firm representing the Ho–Chunk Nation.

the issue, the Court appears to have enlarged state court jurisdiction beyond what existed prior to the compacts. The Court concludes that the words "tribal court only" could have been typed in the compact, but were not. The Court also notes that the tribe consents to suit twice in the compact, yet it only refers to "court of competent jurisdiction" rather than specifically providing for suit in "tribal court only."

¶ 6 Part 6(A)(2), in which the tribe consents to suit, is limited by subsection "C of this part." Subsection C contains the language regarding court of competent jurisdiction. Obviously, the compact could have referred to "tribal court only," "state court only," or "both" courts to reflect the parties' intent, but it does not. Consequently, the portion of the compact in which existing jurisdiction *is not altered* becomes imperative when determining intent—yet the question remains ignored and the Court merely pontificates about the meaning. I do believe that because one size doesn't fit all insofar as tribal courts are concerned, the compact language was deliberately left nonspecific so that the compact could be adapted to fit various jurisdictional scenarios.

> Although the lawsuit was not a tort claim from a casino patron, the Court's discussion of IGRA is illuminating in that it noted that "[T]he legislative history indicates that Congress did not intend to transfer any jurisdictional or regulatory power to the states by means of IGRA unless a tribe consented to such a transfer in a tribal-state compact." The Court also recognized that "Tribal–State compacts are at the core of the scheme Congress developed to balance the interests of the federal government, the states, and the tribes. They are a creation of federal law, and IGRA prescribes 'the permissible scope of a Tribal–State compact.' "

5. *Duke v. Absentee Shawnee Tribe of Oklahoma Housing Authority*, 199 F.3d 1123, 1125 (10th Cir.1999), *cert denied* 529 U.S. 1134, 120 S.Ct. 2014, 146 L.Ed.2d 963 (2000).

6. As the majority notes, the compact is a state statute. The primary goal of statutory interpretation is to ascertain and follow the intent of the Legislature. *King v. King*, 2005 OK 4, ¶ 22, 107 P.3d 570; *TRW/Reda Pump v. Brewington*, 1992 OK 31, ¶ 5, 829 P.2d 15; *Ledbetter v. Oklahoma Alcoholic Beverage Laws Enforcement Comm'n*, 1988 OK 117, ¶ 7, 764 P.2d 172; *Hess v. Excise Bd. of McCurtain County*, 1985 OK 28, ¶ 6, 698 P.2d 930. Where a statute's meaning is ambiguous or unclear, we employ rules of statutory construction to give the statute a reasonable con-

¶ 7 All statutory ambiguities are generally construed in favor of Indian sovereignty.[5] Evidence of what the compacting parties truly intended can also be found by considering the compact as a whole.[6] The Court neglects to consider that in addition to tort claims, the same provisions apply for prize claim disputes. Immunity is waived for prize claim disputes and procedures are set forth much like tort claims. Did the federal government (through IGRA) and the State of Oklahoma and Oklahoma Indian Tribes (through compacting) intend that if a patron enters onto tribal land, voluntarily engages in tribal gaming activities, disputes a prize claim (or lack thereof), that the plaintiff could readily choose between three forums as the concurring opinion suggests?

¶ 8 While this may one day be the law—depending on what the United States Supreme Court ultimately decides—it is not now, nor has the concurring opinion provided any support in its assertions to show that it is. The majority's analysis is bottomed on the traditional right of a plaintiff in a civil lawsuit to choose the venue of the lawsuit.

struction that will avoid absurd consequences. *Dean v. Multiple Injury Trust Fund*, 2006 OK 78, ¶ 9, 145 P.3d 1097; *Head v. McCracken*, 2004 OK 84, ¶ 16, 102 P.3d 670; *TRW/Reda Pump v. Brewington*, supra. It is important in construing the Legislative intent behind a word to consider the whole act in light of its general purpose and objective, considering relevant portions together to give full force and effect to each. *Saul v. Alcorn*, 2007 OK 90, ¶ 19 fn. 31, 176 P.3d 346; *King v. King*, supra; *Simpson v. Oklahoma Alcoholic Beverage Control Bd.*, 1965 OK 206, ¶ 18, 409 P.2d 364; *Oklahoma Natural Gas Co. v. Corporation Comm'n of Okla.*, 1923 OK 400, ¶ 0, 216 P. 917. A statute will be given a construction, if possible, which renders every word operative, rather than one which makes some words idle and meaningless. *State ex rel. Thompson v. Ekberg*, 1980 OK 91, ¶ 7, 613 P.2d 466; *Integrity Mut. Cas. Co. v. Garrett*, 1924 OK 721, ¶ 11, 229 P. 282; *Matthews v. Rucker*, 1918 OK 29, ¶ 5, 170 P. 492.

We presume that the Legislature expressed its intent and intended what it expressed, and statutes are interpreted to attain that purpose and end, championing the broad public policy purposes underlying them. *McClure v. ConocoPhillips, Co.*, 2006 OK 42, ¶ 12, 142 P.3d 390; *King v. King*, supra; *Cox v. State ex rel. Okla. Dept. of Human Services*, 2004 OK 17, ¶ 19, 87 P.3d 607.

Again I ask, why would Congress have included a provision in IGRA allowing Tribes and States to negotiate an allocation of jurisdiction to the states if state courts, federal courts, and tribal courts already had such jurisdiction? If this were true, the jurisdiction provisions of IGRA are meaningless.

¶ 9 I am also puzzled by the majority's use of the "voter-approved" compact by citing the ballot title in its attempt to bolster the argument that the compact is no ordinary contract and that the voters somehow approved one court's jurisdiction over another. The verbatim recitation of the ballot title clearly shows the voters neither implicitly nor expressly knowingly voted concerning the jurisdiction of tort claims. At 2004 Okla. Sess. Laws, ch. 316, it provides:

> This measure creates the State–Tribal Gaming Act. It would allow some types of gaming machines at some horse race tracks in this state. The Oklahoma Horse Racing Commission would oversee the new types of gaming machines. It would require that a portion of the money wagered on such gaming be paid to the state. Some of the money would go to purses for horse races. Some of the money would go to the horse race tracks. The measure also provides a model compact which Indian tribes may enter into and then operate such gaming machines on Indian lands. The model compact provides regulatory controls for gaming authorized by the compact. The Office of State Finance would have the authority to oversee this gaming by the tribes. The state's portion of the money from the gaming authorized by this act would go for treatment of compulsive gambling disorders, to the Education Re-

form Revolving Fund and for college scholarships.

Clearly, the voters were asked to decide whether to allow gaming at race tracks and gaming on Indian land. There is nothing in this measure notifying the voter of anything at all regarding tort claims, much less which court would have jurisdiction of such claims. Consequently, the premise of both the majority opinion and the concurring opinion that "court of competent jurisdiction" is voter-sanctioned to be the state courts over the tribal court is inexplicable.

¶ 10 The majority opinion surmises that the state, by virtue of IGRA and the language of the compact, acquires concurrent jurisdiction with tribal courts over gaming-related tort claims against Indian Tribes which have a Gaming Compact with the state. To reach this conclusion, the majority must assume, without deciding, that courts of the State of Oklahoma are generally courts of competent jurisdiction to adjudicate tort claims against Indian tribes for tribal activity on tribal land. It intimates that this jurisdiction is established by the authority of the Oklahoma constitution and that no federal law or state statute may alter it.

¶ 11 The fallacy of this reasoning is exemplified by the Federal Indian Child Welfare Act (FICWA). Under certain circumstances Oklahoma lacks any authority over an Indian child.[7] For instance, if the child lives on trust or restricted land, or in a dependent Indian community, the state may not have the authority to proceed and the case must be heard in tribal court. In other cases, jurisdiction with the state is concurrent, but the state, in the absence of good cause, must transfer the proceeding to the tribal court.[8]

7. 25 U.S.C.A. § 1901 et seq.

8. 25 U.S.A. § 1911 (1978) provides:

> (a) Exclusive jurisdiction
> An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.

> (b) Transfer of proceedings; declination by tribal court
> In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: Provided, That such transfer shall be subject to declination by the tribal court of such tribe.
> (c) State court proceedings; intervention

The FICWA, as does IGRA, illustrates that Congress can and does decide whether the State of Oklahoma may assert civil jurisdiction over Indian tribes, notwithstanding the assertion that "adjudicatory jurisdiction is constitutionally vested in our state courts."

## CONCLUSION

¶ 12 The United States Constitution recognizes that Indian Tribes are to be treated on an equal level with the governments of foreign nations as well as the states.[9] The Oklahoma Constitution recognizes that all tribal lands lying within Oklahoma boundaries shall be subject to the jurisdiction of the United States.[10] IGRA embodies the general goal of federal Indian policy: to allow tribal self-government with federal control.[11] It requires states and tribes to negotiate regarding the scope of authorized gaming and the State's role in Indian gaming. As part of this process, IGRA allows states and tribes to negotiate and to include jurisdiction-shifting provisions in the compact.[12] Had Congress not considered tribal courts to have subject matter jurisdiction over lawsuits

In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.
(d) Full faith and credit to public acts, records, and judicial proceedings of Indian tribes
The United States, every State, every territory or possession of the United States, and every Indian tribe shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity.

9. Art. 1, § 8 of the United States Constitution provides that "[t]he Congress shall have the power to ... regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

10. Art. 1, § 3 of the Oklahoma Constitution provides in pertinent part:
The people inhabiting the State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States....

11. Title 25 U.S.C. § 2701 provides:
The Congress finds that—
(1) numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue;
(2) Federal courts have held that section 81 of this title requires Secretarial review of management contracts dealing with Indian gaming, but does not provide standards for approval of such contracts;
(3) existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands;

(4) a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and
(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.
Title 25 U.S.C. § 2702 provides:
The purpose of this chapter is—
(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;
(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and
(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

12. Title 25 U.S.C. § 2710(d)(3)(C) provides:
(C) Any Tribal–State compact negotiated under subparagraph (A) may include provisions relating to—
(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

which relate to or arise out of gaming and gaming enterprises, why would it have included a provision in IGRA which allowed tribes and states to negotiate an allocation of jurisdiction to the states?

¶ 13 This whole discussion may become moot. The compact became effective February 9, 2005, and it does not expire until 2020. At that time it automatically renews for successive 15 year periods. However, the compact also provides that it may be terminated by mutual consent. If the Tribe and the State are truly in accord with what was their mutual intent at the time of compacting, they may terminate and renegotiate the compact insofar as "a court of competent jurisdiction" is concerned.[13]

ATTACHMENT

IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

DANNY DYE and PAT DYE,
Husband and Wife,
 Plaintiffs/Appellants,

v.

CHOCTAW CASINO OF POCOLA, OKLAHOMA, and THE CHOCTAW NATION OF OKLAHOMA,
 Defendants/Appellees.

No. 104,737

**ORDER**

The Oklahoma State Treasurer's application for leave to file an attached statement, filed on May 15, 2008, is DENIED, and the statement is STRICKEN.

Done by order of the Supreme Court this 27th day of May, 2008.

/s/ James R. Winchester
 CHIEF JUSTICE

REIF, J., with whom EDMONDSON, C.J., joins, dissenting.

¶ 1 I respectfully dissent.

¶ 2 The case at hand involves the same jurisdictional issue as the case of *Cossey v. Cherokee Nation Enterprises, LLC*, 2009 OK 6, 212 P.3d 447; that is, whether the courts of the State of Oklahoma have jurisdiction of tort claims against an Indian tribe that arise from tribal gaming operations on tribal lands. This controversy stems from the fact that the Gaming Compacts between the State and Indian tribes do not specifically state that State courts have jurisdiction over such claims. The majority opinion in *Cossey* and the majority opinion herein interpret the tribe's "consent to suit in a court of competent jurisdiction" set forth in the Compacts as conferring jurisdiction on State courts. In *Cossey*, I dissented from the majority holding that this language gives State courts jurisdiction over gaming-related tort claims against the Cherokee Nation. The same analysis and authority set forth in my dissent in *Cossey* lead me to likewise dissent from the majority holding herein that this language gives State courts jurisdiction over such tort claims against the Choctaw Nation.

¶ 3 Under the majority interpretations, Oklahoma courts acquire concurrent jurisdiction with tribal courts over gaming-related tort claims against Indian tribes that have a Gaming Compact with the State. The majority herein reasons that if tribal courts were intended to be the only courts of competent

---

**13.** Part 15 of the Compact relates to duration and negotiation and it provides in pertinent part:

... B. This Compact shall have a term which will expire on January 1, 2020, and at that time, if organization licensees or others are authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing pursuant to any governmental action of the state or court order following the effective date of this Compact, the Compact shall automatically renew for successive additional fifteen-year terms; provided that, within one hundred eighty (180) days of the expiration of this Compact or any renewal thereof,

either the tribe or the state, acting through its Governor, may request to renegotiate the terms of subsections A and E of Part 11 of this Compact.

C. This Compact shall remain in full force and effect until the sooner of expiration of the term or until the Compact is terminated by mutual consent of the parties....

The state hereby agrees that this subsection is severable from this Compact and shall automatically be severed from this Compact in the event that the United Stated Department of the Interior determines that these provisions exceed the state's authority under IGRA.

jurisdiction to adjudicate tort claims against the tribes, then the tribes would have expressly limited their consent to suit "in tribal court only." The majority cites examples from other compacts where similar limiting language appears and emphasizes that it would have been a simple matter for the tribes to type such a limitation into their respective Compacts.

¶ 4 My disagreement with the majority on this point stems from the fact that the courts of the State of Oklahoma are not generally courts of competent jurisdiction to adjudicate tort claims against Indian tribes for tribal activity on tribal lands. The majority opinions in both *Cossey* and the case at hand acknowledge that the State of Oklahoma did not assume jurisdiction over tribal lands pursuant to Public Law 280. While state courts can acquire jurisdiction over tribes incidental to a Congressional delegation of power to the State to regulate tribal activity, the Federal Indian Gaming Act does not involve a Congressional delegation of power to the State of Oklahoma. Finally, when the State of Oklahoma wants a tribe to submit to the jurisdiction of a state court under a compact, the State of Oklahoma has explicitly said so. *See* 68 O.S.2001 § 500.63(C)(8).

¶ 5 In my opinion, the key to this controversy lies in the sovereign to sovereign status quo that exists between the State of Oklahoma and Indian tribe at the time they enter into any type of compact. This status quo is best described in the Motor Fuel Compact Act: "Both the State of Oklahoma and the accepting Indian tribe recognize, respect and accept the fact that under applicable laws each is a sovereign with dominion over their respective territories and governments." 68 O.S.2001 § 500.63(C)(10).

¶ 6 In the Federal Indian Gaming Act, Congress expressly authorized the State and Indian tribes to change their sovereignty status quo with respect to (1) the application of the criminal and civil laws and regulations of the Indian tribe or the State and (2) the allocation of criminal and civil jurisdiction between the State and Indian tribe. 25 U.S.C. § 2710(d)(3)(C)(i) and (ii). However, the Gaming Compact between the State of Oklahoma and the Choctaw Nation does not expressly provide for the application of the civil laws of the State of Oklahoma to tribal lands nor does it expressly allocate civil jurisdiction to the courts of the State of Oklahoma. Instead, the Compact plainly states: "This Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction."

¶ 7 In other words, the Compact does not alter the sovereignty status quo as to courts that possess competent jurisdiction to adjudicate a claim against the tribe for tribal activity on tribal land. In view of this fact, use of the modifying term "competent jurisdiction" to describe the court in which the tribe consents to suit, clearly refers to courts which have jurisdiction to adjudicate claims against the tribe in the absence of the compact. In this context, the modifying term "competent jurisdiction" is just as effective to limit jurisdiction to tribal courts as saying "in tribal courts only."

¶ 8 Even though I dissent from the holdings of the majority opinions, I readily agree with the views expressed in the opinions that one of the key purposes of the Gaming Compacts is to hold tribes liable for personal injury and property loss sustained by patrons and attributable to tribal gaming operations. To achieve this end, the State sought and received (1) the tribe's waiver of sovereign immunity and a claims process to pursue tribal liability comparable to that found in Oklahoma's Governmental Tort Claims Act, (2) the tribe's consent to suit on disputed claims in a court competent to determine tribal liability, and (3) the tribe's assurance that patrons would be afforded due process in seeking and receiving just and reasonable compensation for a tort claim for personal injury or property damage. Nowhere in the Compacts at issue, however, did the State and tribes expressly agree that Oklahoma law would apply in this process or that State courts were empowered to determine tribal liability. Perhaps my chief disagreement with the majority opinions in *Cossey* and the case at hand lies in the fact that they extend state law and state civil adjudicatory jurisdiction to tribal lands and tribal governments by implication when the parties did not expressly agree to do so in the face of express

authority in the Federal Indian Gaming Act on this subject.

¶ 9 In my opinion, the only provision in the Compact that implicates the exercise of *jurisdiction* over a tort claim *by a court other than a tribal court* is the "due process" provision. In this provision, tribes agree to "ensure that patrons of a facility are afforded due process in seeking and receiving just and reasonable compensation for a tort claim for personal injury and property damage." Congress has generally mandated that no Indian tribe in exercising powers of self-government shall deprive any person of liberty or property without due process of law. 25 U.S.C. § 1302. This includes exercise of the tribe's judicial power. 25 U.S.C. § 1301(2). If a tribal court did not afford a tort claimant due process, or the tribe did not provide a court to determine its liability, such denials of due process would present a federal question to support adjudication of a claim in federal court.

¶ 10 For the foregoing reasons I would affirm the district court's dismissal of the plaintiff's district court suit against the Choctaw Casino of Pocola and the Choctaw Nation.