TREAT v. STITT



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:TREAT v. STITT

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 TREAT v. STITT
2021 OK 3
Case Number: 118913
Decided: 01/26/2021
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2021 OK 3, __ P.3d __

 

THE HONORABLE GREG TREAT, SENATE PRESIDENT PRO TEMPORE, in his official capacity, and THE HONORABLE CHARLES MCCALL, SPEAKER OF THE HOUSE, in his official capacity, Petitioners,
v.
THE HONORABLE J. KEVIN STITT, GOVERNOR OF THE STATE OF OKLAHOMA, in his official capacity, Respondent.

ORIGINAL PROCEEDING FOR DECLARATORY RELIEF

¶0 Petitioners brought this action seeking declaratory relief that Respondent lacked authority to enter into two tribal gaming compacts on behalf of the State. The Court assumes original jurisdiction and grants the declaratory relief sought by Petitioners that the two tribal gaming compacts are invalid under Oklahoma law.

ORIGINAL JURISDICTION ASSUMED AND 
DECLARATORY RELIEF GRANTED. 

V. Glenn Coffee, Cara Rodriguez, Denise Lawson, Glenn Coffee & Associates, PLLC, Oklahoma City, Oklahoma, for Petitioners.

Phillip G. Whaley, Daniel G. Webber, Jr., Patrick R. Pearce, Jr., Matthew C. Kane, Ryan Whaley, Oklahoma City, Oklahoma, for Respondent.

Mark E. Burget and Jeffrey C. Cartmell, Office of the Governor, Oklahoma City, Oklahoma, for Respondent.

Winchester, J.

¶1 Petitioners, the Honorable Greg Treat, Senate President Pro Tempore, and the Honorable Charles McCall, Speaker of the House, request the Court to assume original jurisdiction to declare that the new tribal gaming compacts between the State and the United Keetoowah Band of Cherokee Indians and between the State and the Kialegee Tribal Town are invalid under Oklahoma law. The Court assumes original jurisdiction. Okla. Const. art. VII, § 4. The Court invokes its publici juris doctrine to assume original jurisdiction here as Petitioners have presented this Court with an issue of public interest in urgent need of judicial determination. Fent v. Contingency Review Bd., 2007 OK 27, ¶ 11, 163 P.3d 512, 521. The Court grants the declaratory relief sought by Petitioners, as the Executive branch did not validly enter into the new tribal gaming compacts with the United Keetoowah Band of Cherokee Indians and the Kialegee Tribal Town. Ethics Comm'n of State of Okla. v. Cullison, 1993 OK 37, ¶ 4, 850 P.2d 1069, 1072.

FACTS AND PROCEDURAL HISTORY

¶2 This Court previously declared that the tribal gaming compacts the Executive branch entered into with the Comanche and Otoe-Missouria Tribes were invalid under Oklahoma law because the gaming compacts authorized certain forms of Class III gaming prohibited by state law. Treat v. Stitt, 2020 OK 64, ¶¶ 6-8, 473 P.3d 43, 45 (Treat I). While Treat I was pending before this Court, the Executive branch entered into two additional compacts with the United Keetoowah Band of Cherokee Indians and the Kialegee Tribal Town. The parties to the compacts submitted the tribal gaming compacts to the United States Department of the Interior, and the Department of the Interior deemed them approved by inaction, only to the extent they are consistent with the Indian Gaming Regulatory Act (IGRA). 25 U.S.C. § 2710(d)(8)(C). The Court acknowledges that the United Keetoowah Band of Cherokee Indians and the Kialegee Tribal Town are not parties in this matter; these Tribes are sovereign nations and have not submitted to the jurisdiction of this Court.

¶3 The question before this Court is whether the Executive branch validly entered into the new tribal gaming compacts with the United Keetoowah Band of Cherokee Indians and the Kialegee Tribal Town. We hold it did not. For the new compacts to be valid under Oklahoma law, the Executive branch must have negotiated the new compacts within the statutory bounds of the Model Tribal Gaming Compact (Model Compact)[1] or obtained the approval of the Joint Committee on State-Tribal Relations.

DISCUSSION

¶4 The issue before this Court, as in Treat I, implicates the separation of powers. To better understand the balance of powers between the Executive branch and the Legislative branch in negotiating and entering into tribal gaming compacts, we must look at the history of tribal gaming in Oklahoma.

¶5 Gambling has long been broadly prohibited by Oklahoma's criminal laws,[2] and carving out exceptions to these criminal laws is a question of public policy.[3] The Legislature, through a vote of the citizens of Oklahoma, carved out certain exceptions to gambling when it enacted the State-Tribal Gaming Act, 3A O.S.2011, §§ 261-282. State Question No. 712 proposed to the citizens contained the specific language found in the State-Tribal Gaming Act, which sets forth the terms and conditions under which the State's federally recognized Tribes can engage in Class III gaming on tribal land through compacts. The citizens of Oklahoma approved a specific statutory process by which the State enters into Model Compacts with Indian Tribes within Oklahoma. See 3A O.S. Supp. 2018, §§ 280, 280.1; 3A O.S. Supp. 2012, § 281(15)(A) and (16). The Executive branch's role is to administer the State-Tribal Gaming Act by advocating and negotiating compacts within the bounds of the law. Treat I, 2020 OK 64, ¶ 5, 473 P.3d at 44.

¶6 The Executive branch's authority to advocate and negotiate gaming compacts is statutory--not constitutional. Id. ¶ 5, 473 P.3d at 44. And the use of such authority must be in conformity with statute. Oklahoma statutes currently provide the Executive branch two methods by which it can negotiate tribal gaming compacts: (1) via the Model Compact,[4] or (2) via the general statutory authority conferred under 74 O.S. Supp. 2012, § 1221(C), which requires the approval of the Joint Committee on State-Tribal Relations (Joint Committee) when a tribal gaming compact contains provisions different from those in the Model Compact. The Executive branch did not follow either of these two methods in entering into the new compacts with the United Keetoowah Band of Cherokee Indians and the Kialegee Tribal Town.

I. Model Compact Method. 

¶7 The first method by which the Executive branch can negotiate tribal gaming compacts is through the Model Compact, approved by the citizens of Oklahoma. But the Model Compact confers little negotiating authority to the Executive branch as the Model Compact is not an ordinary private contract. Griffith v. Choctaw Casino of Pocola, 2009 OK 51, ¶ 7, 230 P.3d 488, 491. It is a voter-approved statute codified in the Oklahoma Statutes. Id. Sections 280.1 and 281 of the State-Tribal Gaming Act set out the provisions of the Model Compact. See 3A O.S. Supp. 2018, § 280.1; 3A O.S. Supp. 2012, § 281. Because the Model Compact is a state statute, the provisions of the gaming compact are fixed and not negotiable except by Legislative amendment. See Cossey v. Cherokee Nation Enter., LLC, 2009 OK 6, ¶ 12, 212 P.3d 447, 464 (Taylor, J., concurring). It is an "all or none" offer to the Tribes, "which if accepted, constitutes the gaming compact between this [S]tate and the accepting [T]ribe for purposes of IGRA without any further action on behalf of the State of Oklahoma." Griffith, 2009 OK 51, ¶ 14, 230 P.3d at 493. As a result, the Executive branch's authority to negotiate the provisions of the Model Compact is limited.

¶8 Per the Model Compact, the Executive branch's authority to amend the terms and conditions of a Model Compact is constrained to advocating for fees and exclusivity.[5] Its authority does not extend to modifying other terms or provisions of the Model Compact without approval from the Joint Committee, as discussed below. The Court notes the Executive branch could have sole authority to negotiate additional terms and provisions of the Model Compact. However, the Legislature must amend the State-Tribal Gaming Act to grant the Executive branch that authority. Until that time, the Executive branch's authority to negotiate the Model Compact is constrained by the terms of the State-Tribal Gaming Act--to negotiate fees and exclusivity. 3A O.S. Supp. 2012, § 281(15)(B).

II. Joint Committee Method.

¶9 The second method by which the Executive branch can negotiate tribal gaming compacts is by the approval of the Joint Committee. Section 1221(C) of Title 74 grants the Executive branch general authority to negotiate and enter into cooperative agreements with Tribes within the State to address issues of mutual interest.[6] This Court has previously recognized the Legislature's creation of the Joint Committee to oversee agreements between the Tribes and the State, which includes tribal gaming compacts. See e.g., Griffith, 2009 OK 51, ¶ 12, 230 P.3d at 492; Cossey, 2009 OK 6, ¶ 7, 212 P.3d at 471 (Kauger, J., concurring in part, dissenting in part). Since a tribal gaming compact involves trust responsibilities, Section 1221(C) requires two separate approvals for a gaming compact to become effective: approval by the Joint Committee and approval by the Department of Interior. Though 74 O.S. § 1221 has undergone several amendments over the years, the Legislature never withdrew the requirement that such agreements require the approval of both the Joint Committee and Department of Interior. See 74 O.S. Supp. 2012, § 1221(C).

¶10 When the Executive branch negotiates terms of a tribal gaming compact that differ from the Model Compact found in the State-Tribal Gaming Act (outside of the provisions regarding fees and exclusivity as discussed previously), the Executive branch is acting under the general authority given to it pursuant to § 1221(C). It is then necessary that the Executive branch and the Tribe obtain the approval from the Joint Committee prior to submitting the compact to the Department of Interior. 74 O.S. Supp. 2012, § 1221(C)(1); see also Griffith, 2009 OK 51, ¶ 12, 230 P.3d at 492.[7] This method allows for checks and balances of power between the Legislative branch and the Executive branch.

III. Analysis of the compacts with the United Keetoowah Band of Cherokee Indians and the Kialegee Tribal Town.

¶11 The Executive branch did not follow either the Model Compact method or the Joint Committee method in negotiating the new compacts with the United Keetoowah Band of Cherokee Indians and the Kialegee Tribal Town. The Executive branch's authority to negotiate the provisions of the Model Compact is constrained to advocating for fees and exclusivity, which are not at issue in this case. The new compacts contain terms that are different or outside the Model Compact provisions altogether. Due to the statutory nature of the Model Compact, the new and differing provisions operate as the enactment of new laws and/or amend existing laws, which exceeds the authority of the Executive branch. Even if the Executive branch was attempting to negotiate with the United Keetoowah Band of Cherokee Indians and the Kialegee Tribal Town under the general authority conferred pursuant to 74 O.S. Supp. 2012, § 1221(C)(1), the parties were obligated to seek the approval of the Joint Committee. They did not, and the compacts are therefore invalid under Oklahoma law.

CONCLUSION

¶12 The Executive branch's action in entering into the new compacts with the United Keetoowah Band of Cherokee Indians and the Kialegee Tribal Town--containing different terms than the Model Gaming Compact and without approval from the Joint Committee--disrupts the proper balance between the Executive and Legislative branches. Without proper approval by the Joint Committee, the new tribal gaming compacts are invalid under Oklahoma law.

ORIGINAL JURISDICTION ASSUMED AND 
DECLARATORY RELIEF GRANTED. 

CONCUR: Darby, C.J., Kauger (by separate writing), Winchester, Combs, and Gurich, JJ., and Reif, S.J.

CONCUR IN RESULT: Rowe, J. (by separate writing).

DISSENT: Kane, V.C.J.

Kane, V.C.J., dissenting:

"I dissent for the reasons set forth in my dissent to Treat v. Stitt, 2020 OK 64, 473 P.3d 43 (Treat I)."

RECUSED: Edmondson and Colbert, JJ.

FOOTNOTES

[1] See 3A O.S. Supp. 2018, § 280.1; 3A O.S. Supp. 2012, § 281.

[2] See generally 21 O.S.2011, §§ 941-988; e.g., 21 O.S.2011, § 941 (prohibiting card and table games); id. at § 942 (subjecting gamblers to prosecution); id. at § 946 (prohibiting gambling houses); id. at § 982(B) (prohibiting commercial gambling).

[3] See Whirlpool Corp. v. Henry, 2005 OK CR 7, ¶ 4, 110 P.3d 83, 84 (holding only the Legislature may define what constitutes a crime in Oklahoma); see also D.C. v. John R. Thompson Co., 346 U.S. 100, 114 (1953) (holding "[t]he repeal of laws is as much a legislative function as their enactment").

[4] See 3A O.S. Supp. 2018, §§ 280, 280.1; 3A O.S. Supp. 2012, § 281.

[5] Title 3A O.S. Supp. 2012, § 281(15)(B) states:

Within one hundred eighty (180) days of the expiration of this Compact or any renewal thereof, either the tribe or the state, acting through its Governor, may request to renegotiate the terms of subsections A and E of Part 11 of this Compact.

Part 11(A) relates entirely to fees derived from covered gaming revenue. Id. at § 281(11)(A). Part 11(E) sets for the exclusivity fee schedule. Id. at § 281(11)(E).

[6] Title 74 O.S. Supp. 2012, § 1221(C) states:

C. 1. The Governor is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments within this state to address issues of mutual interest. The Governor may elect to name a designee who shall have authority to negotiate and enter into cooperative agreements on behalf of the state with federally recognized Indian tribes as provided for in this section. Except as otherwise provided by this subsection, such agreements shall become effective upon approval by the Joint Committee on State-Tribal Relations.

2. If the cooperative agreements specified and authorized by paragraph 1 of this subsection involve trust responsibilities, approval by the Secretary of the Interior or designee shall be required.

3. Any cooperative agreement specified and authorized by paragraph 1 of this subsection involving the surface water and/or groundwater resources of this state or which in whole or in part apportions surface and/or groundwater ownership shall become effective only upon the consent of the Oklahoma Legislature authorizing such cooperative agreement.

[7] During oral argument before a Referee in Treat I, Petitioners referenced that only two tribal gaming compacts have differed from the Model Compact, and the Tribes and the Executive branch submitted both of those gaming compacts to the Joint Committee for approval.

KAUGER, J., with whom COMBS and GURICH, J.J., join concurring:

¶1 To be clear, the majority's use of the terms "Executive Branch" refers to the respondent, the Governor of the state of Oklahoma. It is the Governor's authority which is in question here. I write separately to explain the historical underpinnings of such authority, or lack thereof.

THE OKLAHOMA GOVERNOR HAS LIMITED GENERAL 
AUTONOMOUS AUTHORITY INDEPENDENT OF WHAT IS
GRANTED BY THE LEGISLATURE, NOR DOES THE GOVERNOR 
HAVE SPECIFIC AUTHORITY TO BIND THE STATE IN TRIBAL 
COMPACTS.

¶2 The Court in Treat v. Stitt, 2020 OK 64, ¶¶4-5, 473 P.3d 43 explained the separation of powers as follows:

. . . The legislative branch sets the public policy of the State by enacting law not in conflict with the Constitution. Okla. Const. art. V, § 1. The Governor has a role in setting that policy through his function in the legislative process, but the Governor's primary role is in the faithful execution of the law. Okla. Const. art. VI, §§ 8 & 11. Oklahoma's separation of powers doctrine is evident in the State's negotiation of tribal gaming compacts with Indian Tribes.

¶5 The Legislature, through the vote of the people, enacted those laws in the State-Tribal Gaming Act. 3A O.S. Supp. 2018, §§ 261-282. The State-Tribal Gaming Act sets forth the terms and conditions under which the State's federally recognized tribes can engage in Class III gaming on tribal land through Model Gaming Compacts. The Governor has the statutory authority to negotiate gaming compacts with Indian tribes to assure the State receives its share of revenue. However, the Governor must negotiate the compacts within the bounds of the laws enacted by the Legislature, including the State-Tribal Gaming Act. See 74 O.S. Supp. 2012, § 1221; Griffith v. Choctaw Casino of Pocola, 2009 OK 51, ¶ 12, 230 P.3d 488, 492.

¶3 Indeed, the Governor argues that the Okla. Const. art. 6, §8 provides him with the general, autonomous, authority to negotiate and to bind the state, executing tribal gaming compacts. The Governor overlooks the fact that there must be a law for him to execute before he can faithfully execute it. Section 8 provides:

The Governor shall cause the laws of the State to be faithfully executed, and shall conduct in person or in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States, and he shall be a conservator of the peace throughout the State.

As far as the Governor's general authority goes, it is recognized that the drafters of the Oklahoma Constitution placed provisions to protect the people of the State of Oklahoma against excessive political and economic power.[1] Oklahoma's historical underpinnings were extremely economically conservative.[2] Fearing excessive power in the hands of one individual, the framers of the Oklahoma Constitution intentionally created a weak state chief executive.[3] The Governor's authority is limited by the Constitution, because the Chief Executive may exercise only the power specifically granted by the Legislature.[4] The Governor is without authority to exercise a discretion not validly and specifically granted by the statutory law and not within the power conferred upon the Chief Executive by the Constitution.[5]

¶4 In Wentz v. Thomas, 1932 OK 636, 15 P.2d 65, the Court explained how Oklahoma's Chief Executive differed substantially from the United States Chief Executive, the President. The Court said:

¶27 Again, there is a fundamental difference between the executive powers of the President of the United States under the federal Constitution and the executive powers of the Governor of this state under our state Constitution. There is no division of the federal executive department; the President has power and control over all of the executive branches of government--each acts as his agent and performs his discretion. It was largely upon this theory that the Myers Case was decided. This is not the case under our state government. The executive authority, under our government, is vested in a Governor and eleven other heads . . .

¶30 The framers of the Constitution doubtless deemed it wise to reserve a residium of executive power which the Legislature could enact into law and vest in a new officer or department as it might deem expedient from time to time and as occasion might demand. . .

¶5 Accordingly, the personnel of many of the departments of our state government are controlled by the Legislative Branch of Government, rather than the Governor.[6] The Oklahoma Legislature has not surrendered much power to the executive branch.[7] The executive authority of the state is split among the Governor, Lieutenant Governor, Secretary of State, State Auditor, Attorney General, State Treasurer, Superintendent of Public Education, Insurance Commissioner, and Labor Commissioner among many others.[8] Other Boards independent of direct control of the Governor, and therefore, essentially equally ranked with the Governor include constitutional boards such as the State Board of Equalization and the Commissioners of the Land Office.[9]

¶6 While the Governor may have substantial powers as a titular head of the state and official spokesman for it, his powers for the most part are very fragmentary.[10] The power of appointment is an indication of a Governor's overall power and authority.[11] We recognized this principle in Keating v. Edmondson, 2001 OK 110, 37 P.3d 882 when we addressed the limitations on the Governor, expressly set forth by the Legislature, for the appointment of the Governor's cabinet. Keating involved a request from the Governor to stay the effectiveness of an Attorney General's opinion which addressed the lack of the Governor's authority to alter the gubernatorial cabinet outside the forty-five day limit allowed for the establishment of a cabinet system under a state statute, as set by the Legislature.

¶7 In Keating, we said:

¶16 The Okla. Const. art. 5, §60 vests the Legislature with the authority to create checks and balances within the executive department.[12] The Governor concedes that it is the legislative prerogative to restrict the organization of the executive cabinet. Since statehood, it has been recognized that the Governor has a limited appointment power.[13] The power of appointment is not an exclusive function of the executive, legislative or judicial departments. The Governor's appointment powers do not arise from any inherent power vested in the office.[14] Although the pursuit of greater appointment powers is nothing new,[15] Oklahoma citizens have reiterated the position that the Governor's appointment powers are limited and that governmental power should be widely dispersed.[16] (Relevant citations included, but renumbered).

We also noted in Keating that the Legislature was:"free to amend the statute" to provide the flexibility that the Governor sought, and it did so in 2003, by changing shall to may. In addition to the Governor's limited power of appointment, most Oklahoma agencies, boards, and commissions are independent of direct control of the Governor.[17] In 2019, the Legislature authorized the Governor to choose the directors of five agencies which previously had been selected by the boards of the agencies.[18] However it left the operation of other state agencies intact.

¶8 While the Governor's role may be faithful execution of the law, which he exceeded, nowhere in the Oklahoma Constitution is the Governor given the autonomous, broad authority to negotiate, execute, and bind the state to completed gaming compacts which are unauthorized by statute. Rather, art. 6, §8 clearly requires the Governor to act as may be prescribed by law. Any authority the Governor might have concerning gaming compacts, must be expressly prescribed by the Legislature. The Legislature neither expressly nor implicitly granted the Governor the power beyond negotiation.

¶9 The State-Tribal Gaming Act explicitly directs the Governor the authority to request re-negotiation,[19] but nowhere, save for the original model compact,[20] does the Act grant the Governor the authority to execute the compact and bind the state. The model compact only does so because it was pre-approved by the Legislature. Title 74 O.S. 2011 §1221 expressly grants the Governor the authority to negotiate and to enter into cooperative agreements with tribes. However, it also very, specifically, reserves authority in the Legislature finally to bind the state by requiring compacts be approved by a statutorily created joint committee before they can become effective. It provides in pertinent part:

A. The State of Oklahoma acknowledges federal recognition of Indian tribes recognized by the Department of Interior, Bureau of Indian Affairs.

B. The State of Oklahoma recognizes the unique status of Indian tribes within the federal government and shall work in a spirit of cooperation with all federally recognized Indian tribes in furtherance of federal policy for the benefit of both the State of Oklahoma and tribal governments.

C. 1. The Governor is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian tribal governments within this state to address issues of mutual interest. The Governor may elect to name a designee who shall have authority to negotiate and enter into cooperative agreements on behalf of the state with federally recognized Indian tribes as provided for in this section. Except as otherwise provided by this subsection, such agreements shall become effective upon approval by the Joint Committee on State-Tribal Relations.

2. If the cooperative agreements specified and authorized by paragraph 1 of this subsection involve trust responsibilities, approval by the Secretary of the Interior or designee shall be required. . . . (Emphasis supplied).

¶10 It is undisputed that the Joint Committee on State-Tribal Relations has not approved the Governor's compacts in this cause. Thus the compacts, in their entirety, are not effective. Whether the joint committee has approved any other agreements or compacts is irrelevant, and not before the Court in this cause.

CONCLUSION

¶11 The Legislature has not authorized the Governor to bind the state with regard to tribal compacts. Nor has it been approved by the Joint Committee on State-Tribal relations.[21] Rather the compact executed by the Governor contravened state law. The Governor's powers are limited by the Constitution. The Governor may exercise only the specific power granted. The Governor's attempt to exceed this authority results in the actions being rendered wholly ineffectual and invalid.[22]

FOOTNOTES

[1] Strickland, Renard J., and Thomas, James C., Most Sensibly Conservative and Safety Radical: Oklahoma's Constitution Regulation of Economic Power, Land Ownership and Corporate Monopoly, 9 Tulsa L. J. 167 (2013).

[2] Renard J. Strickland, and James C. Thomas, Most Sensibly Conservative and Safety Radical: Oklahoma's Constitution Regulation of Economic Power, Land Ownership and Corporate Monopoly, 9 Tulsa L.J. 167 ( 2013) .

[3] Jean Shurmway Warner, Oklahoma Governors, The Almanac of Oklahoma Politics, pg. 10

[4] Johnson v. Walters, 1991 OK 207, ¶5-7, fn. 10-13, Kauger, J., concurring 819 P.2d 694.

[5] See, Compsource Mutual Ins. Co. v. State ex rel. Oklahoma Tax Comm'n, 2018 OK 54, ¶43, 435 P.3d 90; Wells v. Childers, 1945 OK 365, 165 P.2d 371.

[6] Organization & Administrating Oklahoma, The Bookings Institute, 1935.

[7] Jean Shurmway Warner, Oklahoma Governors, The Almanac of Oklahoma Politics, 10.

[8] The Okla. Const. art 6, §1, provides:

A. The Executive authority of the state shall be vested in a Governor, Lieutenant Governor, Secretary of State, State Auditor and Inspector, Attorney General, State Treasurer, Superintendent of Public Instruction, Commissioner of Labor, Commissioner of Insurance and other officers provided by law and this Constitution, each of whom shall keep his office and public records, books and papers at the seat of government, and shall perform such duties as may be designated in this Constitution or prescribed by law.

B. The Secretary of State shall be appointed by the Governor by and with the consent of the Senate for a term of four (4) years to run concurrently with the term of the Governor.

See also, Organization & Administrating Oklahoma, The Bookings Institute, 1935. As of 1935 the Governor's appointment powers were very limited. Some names have changed and some boards and commissions no longer exist anymore, the Legislature has done little to expand the Governor's power of appointment.

"Powers of Appointment. The Governor's administrative position can best be under-stood by noting the extent of his control, through appointment and removal, over the heads of administrative agencies. In Oklahoma, 16 state officers, in addition to the Governor and Lieutenant Governor, are elected. The constitutional elective officers are the following: Attorney General, Secretary of State, State Auditor, State Treasurer, State Examiner and Inspector, Superintendent of Public Instruction, Insurance Commissioner, the three mem¬ bers of the Corporation Commission, Commissioner of Charities and Corrections, Commissioner of Labor, and Chief Mine Inspector. The statutory elective officers are: President of the State Board of Agriculture and four Assistant Mine Inspectors. Two other boards are elected: The Board of Governors of the State Bar, by the active members of the Bar; and the Board of Directors of the Historical Society, by the members of the Society. In addition, the following live boards and commissions are composed exclusively of elective officials: Board of Pardons; Commissioners of the Land Office (constitutional); the State Depository Board; the State Board of Equal¬ ization (constitutional) ; and the Board of Directors of the State Library. In the following three bodies, a majority of the members are ex-officio and elective, the Governor (when he is a member) and the appointive members being in a minority: Securities Commission, State Commission of Agricultural and Industrial Education; and Code Commission. The agencies headed by the above-mentioned officers and boards are clearly independent of direct control by the Governor.

The following 26 officers and boards are appointed by the Governor, but only with the advice and consent of the Senate: Highway Commission, Insurance Board, Fraternal Insurance Board, Banking Board, Building and Loan Board, Board of Public Affairs, Board of Chiropody, Board of Pharmacy, Election Board, Board of Education, Board of Regents of University of Oklahoma, Board of Regents of Oklahoma College for Women, Board of Regents of Northeastern Oklahoma Junior College/ Board of Regents of Colored A. and N. College. Coordinating Board, Budget Officer, State Board of Agriculture, Conservation Commission, Flood Control Board, Game and Fish Com¬ mission, Board of Arbitration and Conciliation, Mining Board, Industrial Commission, Tax Commission, Adjutant General, and Fire Marshal. In the case of some of these latter appointments, there are other limitations on the Governor's freedom of action, the most common one stipulating that the appointee shall be recommended, or selected from a; list submitted by a private association. Such a stipulation applies, for example, to the Banking Board, the Board of Pharmacy, and the Election Board.

There are some other appointments, which do not require confirmation by the Senate but which must be made from nominations or lists submitted by private associations. Officers and boards so appointed include the Board of Dental Examiners, the Board of Embalming, the Board of Examiners of Nurses, the Soldiers' Relief Commission. and the Custodians of the three Memorial Halls.

In the case of two or three boards, the make-up represents mixed systems of appointment, but so arranged as in effect to neutralize wholly or partly the Governor's control. Examples are Advisory Board of the State Farm and Industrial Council, the Forrest Commission, the Board of Arbitration and Concilation.

[9] See discussion note 17, supra.

[10] Organization & Administrating Oklahoma, The Bookings Institute, 1935.

[11] Thad L. Beyle, The Powers of the Governor in North Carolina: Where the Weak Grow Strong* -- Except for the Governor. pg. 31, The Chief Executive, March 1990.

[12] The Okla. Const. art. 5, §60 provides in pertinent part:

"The Legislature shall provide by law for the establishment and maintenance of an efficient system of checks and balances between the officers of the Executive Department . . . "

[13] Oklahoma's territorial law gave the governor the power to make all appointments. Section 2 of Oklahoma's Organic Act, 26 Stat. 82 (1890) provides:

"That the executive power of the Territory of Oklahoma Shall be vested in a governor, who shall hold office for four years and until his successor shall be appointed and qualified, unless sooner removed by the president of the United States. The governor shall reside within said Territory; shall be commander-in-chief of the militia thereof; he may grant pardons for offenses against the laws of said Territory; and reprieves for offenses against the laws of the United States, until the decision of the president can be made known thereon; he shall commission all officers who shall be appointed to office under the laws of said Territory, and shall take care that the laws be faithfully executed."

However, when the people of Oklahoma formed a state government and adopted the Oklahoma Constitution, the appointment power created in the Governor was substantially reduced. The Okla. Const. art. 6, §13 provides:

"The Governor shall commission all officers not otherwise commissioned by law. All commissions shall run in the name and by the authority of the 'State of Oklahoma,' be signed by the Governor, sealed with the Great Seal of the State of Oklahoma, and attested by the Secretary of State. When any office shall become vacant, he shall, unless otherwise provided by law, appoint a person to fill such vacancy, who shall continue in office until a successor shall have been duly elected or appointed, and qualified according to law."

See, R. Henry, "Deliberations About Democracy: Revolutions, Republicanism, & Reform," 34 Willamette L.Rev. 533, 561 (1998), for a discussion of the division of powers among the departments of government in Oklahoma.

[14] Riley v. State ex rel. McDaniel, 1914 OK 251, 141 P. 264.

[15] See, Riley v. State ex rel. McDaniel, note 23, supra. See also, In re Initiative Petition No. 344, 1990 OK 75, ¶3, 797 P.2d 326, which we rejected, in part, because it failed to advise the voters that the Governor would be allowed to appoint a majority of all boards and it removed the power of the Legislature to enact laws determining how vacancies of elected offices of the executive department were filled.

[16] In 1988, the electorate in State Question 613 voted to make the Labor Commissioner an elected state official rather than permit the Commissioner to be appointed by the Governor. The people have also had opportunities to allow appointment to boards and commissions by persons other than the Governor. In 1990, pursuant to State Question 627, the people created the Ethics Commission with appointees by the Governor, Chief Justice, President Pro Tempore of the Senate, Speaker of the House and Attorney General. Okla. Const. art. 6, §10. In 1992, the people approved State Question 649, the Oklahoma Building Bonds Commission, which provided that members be appointed by the Governor and leaders of the two houses. Okla. Const. art. 10, §43.

[17] Organization & Administrating Oklahoma, The Bookings Institute, 1935.

[18] The agencies are the Office of Juvenile Affairs; Oklahoma Department of Corrections; Oklahoma Health Care Authority; Department of Mental Health and Substance Abuse Services; and Oklahoma Department of Transportation. The bills were enacted during the 2019 Legislative session. The bills signed are House Bill 2479; House Bill 2480; House Bill 2483; Senate Bill 456; and Senate Bill 457.

[19] Title 3A O.S. O.S. 2012 §281 (The provisions of the Model Compact) provide in pertinent part:

B. This Compact shall have a term which will expire on January 1, 2020, and at that time, if organization licensees or others are authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing pursuant to any governmental action of the state or court order following the effective date of this Compact, the Compact shall automatically renew for successive additional fifteen-year terms; provided that, within one hundred eighty (180) days of the expiration of this Compact or any renewal thereof, either the tribe or the state, acting through its Governor, may request to renegotiate the terms of subsections A and E of Part 11 of this Compact.

[20] Title 3A O.S. Supp. 2018 §280 provides in pertinent part:

The State of Oklahoma through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe, and by means of the execution of the State-Tribal Gaming Act, and with the concurrence of the State Legislature through the enactment of the State-Tribal Gaming Act, hereby makes the following offer of a model tribal gaming compact regarding gaming to all federally recognized Indian tribes as identified in the Federal Register within this state that own or are the beneficial owners of Indian lands as defined by the Indian Gaming Regulatory Act, 25 U.S.C., Section 2703(4), and over which the tribe has jurisdiction as recognized by the Secretary of the Interior and is a part of the tribe's "Indian reservation" as defined in 25 C.F.R., Part 151.2 or has been acquired pursuant to 25 C.F.R., Part 151, which, if accepted, shall constitute a gaming compact between this state and the accepting tribe for purposes of the Indian Gaming Regulatory Act. Acceptance of the offer contained in this section shall be through the signature of the chief executive officer of the tribal government whose authority to enter into the compact shall be set forth in an accompanying law or ordinance or resolution by the governing body of the tribe, a copy of which shall be provided by the tribe to the Governor. No further action by the Governor or the state is required before the compact can take effect. A tribe accepting this Model Tribal Gaming Compact is responsible for submitting a copy of the Compact executed by the tribe to the Secretary of the Interior for approval and publication in the Federal Register. The tribe shall provide a copy of the executed Compact to the Governor. No tribe shall be required to agree to terms different than the terms set forth in the Model Tribal Gaming Compact, which is set forth in Section 281 of this title. As a precondition to execution of the Model Tribal Gaming Compact by any tribe, the tribe must have paid or entered into a written agreement for payment of any fines assessed prior to the effective date of the State-Tribal Gaming Act by the federal government with respect to the tribe's gaming activities pursuant to the Indian Gaming Regulatory Act. . . .

[21] The Oklahoma Constitution prohibits the unlawful delegation of a legislative authority. Okla. Const. art. IV, §1 provides:

The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others.

The Okla. Const. art. V, §1 provides:

The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature.

The constitutionality of the Joint Committee of State-Tribal relations as an unlawful delegation of legislative authority has not been challenged in this cause or any other. Because the compacts were not submitted to the committee, if we were to address it sua sponte, it would be merely advisory. We do not issue advisory opinions. Dank v. Benson, 2000 OK 40, ¶ 7, 5 P.3d 1088; Keating v. Johnson, 1996 OK 61, ¶ 0, 918 P.2d 51; Application of Fun Country Development Auth., 1977 OK 138, ¶ 3, 566 P.2d 1167. Furthermore, we are bound by the record presented for review. Heirshberg v. Slater, 1992 OK 84, ¶ 5, 833 P.2d 269; Snyder v. Smith Welding & Fabrication, 1986 OK 35, ¶ 1, 746 P.2d 168 [Supplemental opinion on rehearing].

[22] Johnson v. Walters, 1991 OK 107 at ¶¶ 5--7, fn. 10--13 (concurring opinion), 819 P.2d at 703.

ROWE, J., concurring in result:

¶1 I concur with the Court's judgment that the new compacts entered into between the Governor and the United Keetoowah Band of Cherokee Indians and the Kialegee Tribal Town, respectively, are invalid under Oklahoma law. I cannot accede, however, as to any finding or implication in the Court's opinion that the Joint Committee could validate these compacts.

¶2 While the facts of this case are slightly different from those in Treat I, in that the compacts at issue here do not expand the scope of permissible Class III gaming, they nevertheless conflict with the STGA in important ways.[1] Because these compacts stand in conflict with Oklahoma law, they operate not only as agreements between the State and the Tribes but also as amendments to Oklahoma law. The Joint Committee cannot make valid and enforceable an unlawful compact.

¶3 A finding or implication to the contrary would be inconsistent with this Court's jurisprudence on the non-delegation doctrine. Article V, Section 1 of the Oklahoma Constitution vests legislative authority in the Legislature exclusively:

The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature.

The non-delegation doctrine "rests on the premise that the legislature must not abdicate its responsibility to resolve fundamental policy making by [1] delegating that function to others or [2] by failing to provide adequate directions for the implementation of its declared policy." City of Oklahoma City v. State ex rel. Okla. Dept. of Labor, 1995 OK 107, ¶12, 918 P.2d 26, 29 (citing Democratic Party of Oklahoma v. Estep, 1982 OK 106, ¶16 n.23, 652 P.2d 271, 277 n.23). If the Joint Committee could approve compacts that operate as amendments to Oklahoma law, the Joint Committee would possess functional legislative authority.[2] Such an arrangement would unquestionably run afoul of the non-delegation doctrine.

FOOTNOTES

[1] Specifically, the compacts grant the Governor exclusive authority to authorize new forms of gaming beyond those permitted by the STGA and to settle disputes arising between the State and the Tribes under the compacts. The compacts also authorize monetary sanctions on the Tribes for violations of the compacts and appropriates those funds to the Office of Management and Enterprise Services.

[2] This does not necessarily render the power of the Joint Committee illusory. The Joint Committee still possesses the power to approve or disapprove compacts that are consistent with Oklahoma law.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2005 OK CR 7, 110 P.3d 83, WHIRLPOOL CORP. v. HENRY
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1986 OK 35, 746 P.2d 168, 57 OBJ 1480, Snyder v. Smith Welding & Fabrication
Discussed
 1914 OK 251, 141 P. 264, 43 Okla. 65, RILEY v. STATE ex rel. McDANIEL.
Discussed
 1990 OK 75, 797 P.2d 326, 61 OBJ 1655, Initiative Petition No. 344, State Question No. 630, In re
Discussed
 1991 OK 107, 819 P.2d 694, 62 OBJ 3397, Johnson v. Walters
Discussed
 1992 OK 84, 833 P.2d 269, 63 OBJ 1824, Heirshberg v. Slater
Discussed
 1993 OK 37, 850 P.2d 1069, 64 OBJ 978, Ethics Com'n of State of Okl. v. Cullison
Discussed
 2001 OK 110, 37 P.3d 882, 72 OBJ 3672, KEATING v. EDMONDSON
Discussed
 1945 OK 365, 165 P.2d 371, 196 Okla. 353, WELLS v. CHILDERS
Discussed
 1932 OK 636, 15 P.2d 65, 159 Okla. 124, WENTZ v. THOMAS.
Discussed
 1995 OK 107, 918 P.2d 26, 66 OBJ 3184, City of Oklahoma City v. State ex rel. Oklahoma Dept. of Labor
Discussed
 1996 OK 61, 918 P.2d 51, 67 OBJ 1680, Keating v. Johnson
Discussed
 2007 OK 27, 163 P.3d 512, FENT v. CONTINGENCY REVIEW BOARD
Discussed
 2009 OK 6, 212 P.3d 447, COSSEY v. CHEROKEE NATION ENTERPRISES, LLC
Discussed at Length
 2009 OK 51, 230 P.3d 488, GRIFFITH v. CHOCTAW CASINO OF POCOLA
Discussed at Length
 1977 OK 138, 566 P.2d 1167, APPLICATION OF FUN COUNTRY DEVELOP. AUTHORITY
Discussed
 2018 OK 54, 435 P.3d 90, COMPSOURCE MUTUAL INSUR. CO. v. STATE ex rel. OKLA. TAX COMM. and OKLA. ASSOC. OF ELECTRIC SELF INSURERS FUND v. STATE OF OKLA. TAX COMM.
Discussed
 2020 OK 64, 473 P.3d 43, TREAT v. STITT
Discussed at Length
 2000 OK 40, 5 P.3d 1088, 71 OBJ 1291, Dank v. Benson
Discussed
 1982 OK 106, 652 P.2d 271, Democratic Party of Oklahoma v. Estep
Discussed
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 941, Gambling - Conducting - Penalty - Felony
Cited
Title 3A. Amusements and Sports
 Cite
Name
Level

 3A O.S. 280, Offer of Model Tribal Gaming Compact
Discussed at Length
 3A O.S. 281, Provisions of the Model Tribal Gaming Compact
Discussed at Length
 3A O.S. 280.1, Gaming Compact Supplements
Discussed
Title 74. State Government
 Cite
Name
Level

 74 O.S. 1221, Unique Status of Indian Tribes within Federal Government
Discussed at Length


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA