OSCN Found Document:STATE OF OKLAHOMA ex rel. STITT v. CITY OF TULSA et al.

 

 
 STATE OF OKLAHOMA ex rel. STITT v. CITY OF TULSA et al.2026 OK 39Case Number: 123368Decided: 05/27/2026SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2026 OK 39, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

STATE OF OKLAHOMA ex rel. J. KEVIN STITT, in his official capacity as Governor of the State of Oklahoma, Petitioner,
v.
CITY OF TULSA, a political subdivision of the State of Oklahoma; MONROE NICHOLS IV, in his official capacity as Mayor of the City of Tulsa; DENNIS LARSEN, in his official capacity as Chief of Police, Tulsa Police Department; JACK BLAIR, in his official capacity as City Attorney for the City of Tulsa, Respondents.

APPLICATION TO ASSUME ORIGINAL JURISDICTION FOR WRIT 
OF MANDAMUS OR PROHIBITION AND DECLARATORY RELIEF

¶0 Petitioner brought this action seeking a writ of prohibition or mandamus and declaratory relief that Respondents entered into an invalid settlement agreement with Muscogee (Creek) Nation. Original jurisdiction is assumed, and the relief sought by Petitioner is granted.

ORIGINAL JURISDICTION ASSUMED;
WRIT OF MANDAMUS AND DECLARATORY RELIEF GRANTED.

General Counsel Benjamin Lepak, Deputy General Counsel Audrey Weaver, and Deputy General Counsel Remington Dean, Office of Governor J. Kevin Stitt, Oklahoma City, Oklahoma, for Petitioner.

Assistant City Attorney Hayes Martin, Tulsa, Oklahoma, for Respondents.

Winchester, J. 

¶1 On December 15, 2025, this Court stayed this proceeding in light of ongoing federal litigation in the United States District Court for the Northern District of Oklahoma ("Northern District") between the Muscogee (Creek) Nation ("Nation") and Respondents. 

¶2 Through settlement efforts in connection with the Northern District lawsuit, Tulsa--represented by Respondent Monroe Nichols IV, Mayor of the City of Tulsa--negotiated and entered into a Joint Settlement Agreement with the Nation. See Joint Settlement Agreement, June 25, 2025, Pet'r's App., Ex. 7 [hereinafter Settlement Agreement]. In the Settlement Agreement, Tulsa agreed that it "will not exercise Criminal Jurisdiction over Indian Defendants on the Nation's Reservation." Settlement Agreement, p. 4. It further agreed to dismiss with prejudice all pending prosecutions in Tulsa's municipal court and to refrain from initiating any future prosecutions against "Indian Defendants" on the Nation's Reservation. Id. at p. 5.

¶3 Petitioner State of Oklahoma ex rel. J. Kevin Stitt, in his official capacity as Governor of the State of Oklahoma ("Petitioner"), sought to intervene in the Northern District case, raising arguments nearly identical to those presented here challenging the validity of the Settlement Agreement. The Northern District denied the request, ruling that the legality of Tulsa's Settlement Agreement with the Nation is a state law issue reserved for Oklahoma courts. It concluded that federal courts should not adjudicate fundamentally internal matters concerning the relationship between a State and its cities. 

¶4 Tulsa and the Nation sought the Northern District's approval of the Settlement Agreement, but the court found that such approval was neither appropriate nor warranted. The parties then filed a Stipulation of Dismissal in the Northern District, specifying that the dismissal was entered pursuant to the terms of their Settlement Agreement. The litigation in the Northern District has since concluded.

¶5 We now lift the stay and assume original jurisdiction. Okla. Const. art. VII, § 4. Petitioner seeks a writ of mandamus or prohibition and injunctive relief, requesting that this Court declare the Settlement Agreement invalid. publici juris doctrine to assume original jurisdiction here, as Petitioner has presented an issue of public interest in urgent need of judicial determination. Fent v. Contingency Rev. Bd., 2007 OK 27163 P.3d 512See, e.g., Treat v. Stitt, 2021 OK 3481 P.3d 240Treat v. Stitt, 2020 OK 64473 P.3d 43Ethics Comm'n of State of Okla. v. Cullison, 1993 OK 37850 P.2d 1069

DISCUSSION

¶6 The limited question before this Court is whether Tulsa entered into a valid agreement with the Nation. 

¶7 The Legislature enacted the laws that govern "State-Tribal Relations" in Oklahoma. See 74 O.S.2021, §§ 1221et seq. While the State aims to foster a cooperative spirit with all federally recognized Indian tribes to further policies that benefit both the State and tribal governments, the Legislature has established the specific terms and conditions under which the State, cities, and Indian tribes can enter into intergovernmental cooperative agreements. Specifically, as to cities:

The governing board of a political subdivision of this state is authorized to negotiate and enter into intergovernmental cooperative agreements in behalf of the political subdivision, with a federally recognized Indian tribal government within this state to address issues of mutual interest. Except as otherwise provided by this subsection, such agreements shall be effective upon approval by the Joint Committee on State-Tribal Relations and the Governor, or the designee of the Governor.

74 O.S.2021, § 1221

¶8 Tulsa possesses the statutory authority to negotiate agreements with Indian tribes; however, any such agreements must adhere to the laws established by the Legislature. See, e.g., Treat, 2020 OK 6474 O.S.2021, § 1221See, e.g., Griffith v. Choctaw Casino of Pocola, 2009 OK 51230 P.3d 488

¶9 Tulsa contends that it was not required to seek approval for the Settlement Agreement because it represents an extension of the existing Intergovernmental Cross-Deputization Agreement between Tulsa and the Nation, entered into on January 18, 2006. 

¶10 We must first determine whether the Settlement Agreement qualifies as an intergovernmental cooperative agreement. Section 1221(D)(1) requires that an intergovernmental cooperative agreement (1) be between a political subdivision and an Indian tribe and (2) focus on issues of "mutual interest." 74 O.S.2021, § 1221 See Settlement Agreement, p. 1. The agreement also consistently emphasizes its "cooperative, intergovernmental approach," discusses matters of "cooperative, intergovernmental cooperation," and highlights that the parties have a "renewed focus on cooperative governance." Given this explicit language, the agreement falls squarely within the scope of § 1221(D)(1) and must comply with its statutory mandates.

¶11 We must next determine whether the Settlement Agreement constitutes a mere extension of the pre-existing Cross-Deputization Agreement or a new, independent agreement requiring approval from the Governor and the Joint Committee. The Settlement Agreement's plain language suggests the latter. Rather than extending prior obligations, it introduces distinct terms and novel responsibilities. Furthermore, the Settlement Agreement treats the Cross-Deputization Agreement as a separate instrument--referencing it only as the mechanism by which Tulsa retains law enforcement authority on the Nation's Reservation--rather than as an underlying contract being amended or renewed. See Settlement Agreement, p. 4.

¶12 The purpose of the Cross-Deputization Agreement is to provide law enforcement services on the Nation's Reservation. It provides a comprehensive framework for protection, authorizing Tulsa police officers to observe violations of the law, effect arrests, respond to calls for assistance, perform investigations, and provide dispatching and detention. See Cross-Deputization Agreement, Section 1, p. 2. The only mention of prosecutorial authority in the Cross-Deputization Agreement is that the "official determination of the correct jurisdictional authority for purposes of prosecution shall be made by the United States Attorney, a Bureau of Indian Affairs Court of Indian Offenses prosecutor, a State prosecutor, and/or the Nation's Attorney General." Id. at Section 9(B), p. 9.

¶13 The Settlement Agreement terms differ from the Cross-Deputization Agreement, as Tulsa agrees not to exercise criminal jurisdiction over the Nation. Further, criminal jurisdiction is broadly defined to include:

The authority of a governmental body, including its law enforcement personnel, prosecutors, or judicial officers, to enforce the applicable criminal laws within a specific geographic area or over particular persons or subject matter, including through criminal investigations, prosecutions, sentencing, or incarceration.

See Settlement Agreement, p. 2. The Settlement Agreement fundamentally alters Tulsa's prosecutorial authority by requiring the dismissal of all pending municipal cases and prohibiting future prosecutions by Tulsa. Unlike the Cross-Deputization Agreement, there is no official determination made regarding the correct jurisdictional authority, and instead, any authority of Tulsa to prosecute tribal members for actions occurring on its Reservation lies solely with the Nation.

¶14 The Settlement Agreement also requires the establishment of a joint working group to assess the shared governance needs and goals. The group will evaluate and recommend additional practices, policies, and cooperative agreements aimed at achieving mutual public safety and law enforcement priorities. The group will generate a "Report and Plan," which will address matters such as:

 

 Booking procedures and transfer of custody;
 Detention facilities and procedures;
 Special services;
 Laboratory testing costs;
 Evidence and property storage;
 Video testimony;
 Warrants and extradition procedures;
 Law enforcement communication, training, policies, and procedures;
 Timely and accurate identification of tribal members; and
 Communication and coordination related to major crimes.

See Joint Settlement Agreement, p. 7. Many of these issues are addressed within the Cross-Deputization Agreement. See, e.g., Cross-Deputization Agreement, Sections 9-10, pp. 9-10 (addressing arrest procedure and facilities, transportation, medical treatment, technical assistance, and training). However, the parties' duties may shift following the issuance of the joint working group's "Report and Plan," as stipulated in the Settlement Agreement.

¶15 Even if the Court were to overlook the differences and conclude that the Settlement Agreement is an extension of the Cross-Deputization Agreement, it nonetheless modifies some of its existing terms. Any amendments to the Cross-Deputization Agreement must be in writing and executed by each party to the agreement. See Cross-Deputization Agreement, Section 4(C), p. 4. The individuals who executed the Cross-Deputization Agreement on behalf of Tulsa included the City Council Chairman, City Attorney, and Chief of Police. See Cross-Deputization Agreement, Exhibit B, Addendum. In contrast, only Mayor Nichols, the City Attorney, and the City Clerk executed the Settlement Agreement, which does not satisfy the requirements for amending the Cross-Deputization Agreement.

¶16 The Settlement Agreement, while reaffirming some principles found in the Cross-Deputization Agreement, serves a distinct and independent purpose. It does not merely extend existing terms; rather, it establishes a new legal framework with different obligations that the parties are required to fulfill. Therefore, the Settlement Agreement is an independent cooperative agreement, separate and distinct from the Cross-Deputization Agreement.

¶17 To be legally enforceable, intergovernmental cooperative agreements made on behalf of a political subdivision must comply with statutory requirements. Under § 1221(D)(1), such agreements become effective only upon approval by both the Joint Committee on State-Tribal Relations and the Governor. Here, neither the Joint Committee nor the Governor approved the Settlement Agreement. The Court holds that the Settlement Agreement is invalid as a matter of law until such time as Tulsa secures the mandatory statutory approvals.

CONCLUSION

¶18 For these reasons, the Court issues a writ of mandamus compelling Tulsa to secure the appropriate statutory approvals if Tulsa wishes to proceed with the Agreement and grants the declaratory relief sought by Petitioner. Because the Agreement lacked the mandatory statutory approvals required under 74 O.S.2021, § 1221

ORIGINAL JURISDICTION ASSUMED;
WRIT OF MANDAMUS AND DECLARATORY RELIEF GRANTED.

CONCUR: Rowe, C.J. (by separate writing), Kuehn, V.C.J., Winchester, Edmondson, Gurich, Darby, Kane, JJ. and Jett, J. (by separate writing).

DISSENT: Combs, J. (by separate writing).

FOOTNOTES

Muscogee (Creek) Nation v. City of Tulsa, et. al., Case No. 23-cv-00490-JDR-CDL (N.D. Okla. Filed Nov. 15, 2023).

Muscogee (Creek) Nation v. City of Tulsa, et. al., Case No. 23-cv-00490-JDR-CDL (N.D. Okla. Filed Mar. 16, 2026).

ROWE, C.J., CONCURRING: 

¶1 I concur with the Court's judgment that to be legally enforceable intergovernmental cooperative agreements made on behalf of a political subdivision must comply with statutory requirements. I remain circumspect that the Joint Committee on State-Tribal Relations is constitutional. In my view, the Joint Committee is an unconstitutional delegation of legislative authority.

¶2 As I discussed in Treat v. Stitt, 2021 OK 3481 P.3d 240Treat v. Stitt, 2021 OK 3481 P.3d 240

JETT, J., concurring: 

¶1 I fully concur in the majority opinion. I write separately to briefly expound upon why this Court's assumption of concurrent original jurisdiction is appropriate in this case. The current dispute both (1) concerns the public interest and (2) presents a pressing need for an early decision. Edmondson v. Pearce, 2004 OK 2391 P.3d 605Id. ¶¶ 11, 16, 91 P.3d at 613, 615.

¶2 It is apparent that this case concerns the public interest. This is a dispute between the Governor and the City of Tulsa, and this case involves municipal exercise of criminal jurisdiction over tribal members in the state's second largest city. This case also implicates the authority of a municipality to enter an intergovernmental cooperative agreement with a tribal nation, which has consequential implications for most of the eastern half of Oklahoma. This is neither a niche issue nor a private dispute; the first prong of our concurrent original jurisdiction test is readily met.

¶3 This case also presents a pressing need for an early decision. As things stand, the City of Tulsa is not "exercis[ing] Criminal Jurisdiction over Indian Defendants on the [Muskogee (Creek)] Nation's Reservation." (Joint Settlement Agreement.) There is a pressing need for a quick resolution because of the time constraints attendant with criminal matters. If the agreement is unlawful, the statute of limitations on certain crimes committed in Tulsa will run. And practically, it becomes more difficult to investigate crimes as time passes.

¶4 This is not a case in which granting interim relief can alleviate the need for an early decision from the Supreme Court. See White v. Stitt, 2025 OK 68579 P.3d 636Id. But in this case, interim relief cannot both preserve the status quo and prevent the harm alleged by Petitioner. This is because the status quo--that the City of Tulsa has unilaterally agreed to not exercise criminal jurisdiction over tribal members on the reservation--is precisely the harm the Governor alleges. 

* * *

¶5 This is a proper case for the Court to assume concurrent original jurisdiction and issue declaratory relief. I concur with the Court's resolution of the merits.

FOOTNOTES

mandatory interim relief, which alters the status quo, is less likely to obviate the urgency of a final decision from this Court. See generally White, 2025 OK 68Owens v. Zumwalt, 2022 OK 14Id. (internal citations omitted). A more exacting standard is required for mandatory injunctions because of the inevitable uncertainty of altering the status quo and the risk of harm to the responding party. In high-stakes public interest litigation, the prospect of a mandatory injunction may carry an untenable risk of unintended consequences or harm to the respondent. In such cases, assuming concurrent original jurisdiction to render an early decision in a matter of public interest may be the prudent course based on the facts of the dispute.

In this case, it would be nearly impossible to fashion a workable mandatory injunction to vitiate the harm alleged by Petitioner. We would essentially have to order the City of Tulsa to investigate and prosecute tribal members for crimes and prohibit Tulsa from dismissing pending criminal cases against tribal members. It would be difficult to fashion a remedy that preserved Tulsa's discretion to decline prosecutions on the basis of limited resources or later discovered exculpatory evidence. And if we attempted to enter an injunction preserving some prosecutorial discretion for Tulsa, it seems inevitable the State would claim Tulsa's non-prosecution decisions were actually an attempt to implement the agreement with the Muskogee (Creek) Nation. A mandatory injunction is plainly unworkable in this case, which also demonstrates the need for an early decision from this Court.

COMBS, J., dissenting:

¶1 I dissent to the majority's assumption of original jurisdiction and grant of declaratory relief to invalidate a settlement agreement reached between the Muscogee (Creek) Nation (hereinafter "Tribe") and the City of Tulsa. The State of Oklahoma, by and through Governor Stitt (Petitioner), has sought a declaratory judgment, injunctive relief, and writs of mandamus and prohibition against the City of Tulsa to prevent--at least at this juncture--the enforcement of a settlement agreement reached between the Tribe and the City in an effort to resolve the litigation between them.

¶2 The Petitioner does not seek relief against the Tribe, nor is the Tribe named as a party to this proceeding. The Tribe therefore has no opportunity to be heard in this matter as pled.

¶3 The underlying issues relating to concurrent jurisdiction are currently before the federal courts, more specifically in Muscogee (Creek) Nation v. Kunzweiler, No. 26-5013 (10th Cir. filed Jan. 29, 2026). Litigation in that appeal is ongoing. The Tribe's initial brief in the Kunzweiler appeal was filed April 29, 2026. That pending appeal could affect both the outcome of the case before us and the viability of the executed settlement agreement at issue because the settlement agreement provides for its own termination in the event of a "Relevant Federal Decision," which is defined as "a decision issued after the effective date of this Agreement by the United States Supreme Court or the United States Court of Appeals for the Tenth Circuit or federal law duly enacted by the United States." Jt. Settlement Agmt. Between Pl. Muscogee (Creek) Nation & Defs. City of Tulsa et al. [Doc. 149-1] ¶ 5, at 2, Muscogee (Creek) Nation v. City of Tulsa, No. 4:23-cv-00490-JDR-CDL (N.D. Okla. filed June 25, 2025). That would make a decision in the Kunzweiler appeal a "Relevant Federal Decision" that could terminate the settlement agreement and moot this case.

¶4 For these reasons, I would deny the Petitioner's Motion to Lift Stay, leave our previously issued stay in place, and await the federal court's guidance.